We affirm the district court's grant of summary judgment for Litton.

**Liane Buix McDONALD, on her own behalf and on behalf of all others, Plaintiff-Appellant,**

v.

**UNITED AIR LINES, INC., a corporation, Defendant-Appellee,**

and

**Association of Flight Attendants, Intervenor-Appellee.**

Nos. 83–3013, 84–1237.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1984.

Decided Sept. 28, 1984.

Rehearing Denied Dec. 5, 1985.

---

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Stephen B. Moldof, Cohen, Weiss & Simon, New York City, Danae K. Prousis, Winston & Strawn, Chicago, Ill., for defendant-appellee.

Before CUDAHY and EDWARDS *, and ESCHBACH, Circuit Judges.

CUDAHY, Circuit Judge.

This appeal is but the latest step in the long and tortuous attempt by former United Airlines ("United") stewardesses to obtain a remedy for sex-based discrimination. This discrimination was engendered by United's former rule which required that all female flight attendants resign their jobs upon marriage. While the rule itself was abrogated in 1968 and its illegality was definitively determined in 1971, litigation to determine the precise form of relief and the membership of the plaintiff class has continued and appears likely to continue for some time into the future.[1] This appeal concerns the proceedings below by which the claimants are required to establish in adversarial hearings conducted by special masters that they are members of the plaintiff class. The claimants must show that they either were fired or forced by United to resign or that they resigned because of the no-marriage rule. By this showing they would become entitled to reinstatement as flight attendants with the forms of competitive and company seniority previously awarded by the district court

---

* Honorable George Clifton Edwards, Jr. for the Sixth Circuit, is sitting by designation.

1. For a fuller discussion of the history of this litigation and the decided cases, see *Romasanta v. United Air Lines, Inc.,* 717 F.2d 1140, 1142–44 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1928, 80 L.Ed.2d 474 (1984).

and affirmed by this court. *Romasanta v. United Air Lines, Inc.*, 717 F.2d 1140 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1928, 80 L.Ed.2d 474 (1984).

Two appeals are in fact involved at this stage. The first involves primarily the interpretation of an order issued by Judge Moran on November 9, 1983, clarifying the Order of Reference of October 29, 1982 to the special masters. The Order of Reference set out the legal principles which the masters are to follow in conducting the hearings and determining each claimant's right to be considered part of the class. This first appeal also involves a group of claimants as to whom adverse reinstatement recommendations from the masters were affirmed by the district court. The district court granted plaintiffs a Rule 54(b) certificate and also noted that its decision was appealable under 28 U.S.C. § 1292(a)(1) as an order denying an injunction. The second appeal involves the district court's subsequent affirmance of the masters' adverse recommendations with respect to an additional five claimants and its entry of an order allowing an appeal for this second group under 28 U.S.C. § 1292(a)(1) as well as pursuant to a Rule 54(b) certificate. Both of these appeals were later consolidated.

Appellants raise two issues. First, they challenge the principles involving allocation of the burdens of proof and production as contained in the Order of Reference and as clarified in the November 9, 1983 order. Second, appellants challenge the manner in which the masters have applied these principles to individual claimants, in particular the nine claimants whose appeals are now before this court. For the reasons stated below, we affirm in part, reverse in part and remand to the district court for further proceedings, as necessary, which are not inconsistent with this opinion.

I

The plaintiff class had originally proposed in 1980 the use of an affidavit procedure to determine whether a particular claimant was entitled to be a member of the class. The district court, however, rejected this procedure and decided to utilize adversary hearings to be presided over by special masters to determine the status of individual claimants. The Order of Reference issued by the district court set out legal principles involving primarily evidentiary considerations which the masters were to apply in formulating their recommendations to the district court concerning reinstatement. The district court also apparently limited the masters' hearings to the determination of entitlement to reinstatement and excluded the issue of eligibility for backpay. The relevant provisions of the Order of Reference include the following:

*Principles*

4. Only a claimant who resigned or was terminated as a United flight attendant between July 29, 1965 and November 7, 1968 (the "class period") is eligible to attempt to prove that she is a member of the class. The claimant has the burden of proving that she is a member of the class.

5. When an eligible claimant proves she was married at the time of her [r]esignation or termination, or that she married within 90 days after her resignation or termination, those opposing reinstatement will have the burden of going forward with a showing that some reason other than the no-marriage rule led to the end of her employment as a flight attendant.

6. Some indication[s] that an eligible claimant may have resigned or been terminated because of the no-marriage rule are the following:

(a) she concealed her marriage and continued to fly; or

(b) she on marriage sought transfer to ground employment with United; or

(c) she sought other employment before or within 90 days after her termination or resignation; or

(d) she is found by the Special Master to have made contemporaneous protests to her supervisor or United

management about her dissatisfaction with the no-marriage rule.

7. Some indication[s] that an eligible claimant may have resigned or been terminated for a reason other than the no-marriage rule are the following:

(a) she gave United a reason inconsistent with the no-marriage rule as the reason for her resignation or termination; or

(b) she failed to apply for a transfer with United, to seek other employment outside the company, or to apply for unemployment compensation at or about the time of her resignation or termination.

Following issuance of the Order of Reference, the defendant, United Air Lines, Inc., and the intervenor, the Association of Flight Attendants ("AFA"), asked the district court to reconsider the provisions of the Order of Reference which concern the allocation of burdens of proof and production during the hearings. In its memorandum to support its motion to reconsider the Order of Reference, AFA argued that paragraph 5 should be eliminated and the claimant's marital status at the time of termination or resignation merely added as an additional factor to be considered under paragraph 6. AFA based its argument primarily on the fact that the burden of proof was to remain always on the claimant as the "law of the case" established in a prior Seventh Circuit decision. That decision stated in a footnote: "The stewardesses who resigned must, as counsel for the plaintiff acknowledged at oral argument, show that their retirement was involuntary and on account of the invalid rule to be entitled to relief." *McDonald v. United Air Lines, Inc.,* 587 F.2d 357, 360 n. 4 (7th Cir.1978).

The class opposed the motion to reconsider primarily on the ground that, under an analogy to *International Brotherhood of*

*Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the "burden" or "burden of explanation" shifts to the employer once the claimant makes a threshold showing of discrimination. According to the plaintiff class, this interpretation of *Teamsters* was consistent with the footnote quoted above from *McDonald* because "the footnote, in plaintiffs' view, says only that the burden of persuasion that the termination is because of the [no marriage] rule stays on the claimant." R.Doc. 685 at 3. It thus seems clear that the plaintiffs interpreted the Order of Reference to shift only the burden of production, and not the burden of proof, to the defendant once the claimant has made the threshold showing. This, of course, is consistent with paragraph 4 of the Order of Reference which explicitly states that the claimant has the burden of proving she is a member of the class. At no point prior to initiation of the appeals from the masters' determinations did the plaintiff class apparently challenge, even indirectly, paragraph 4 of the Order of Reference.

In their appeal to Judge Moran from the masters' adverse determinations, the class asserted that, in line with *Teamsters,* once the claimant makes a prima facie showing, the employer has the burden of proving by clear and convincing evidence that its illegal policy was not the cause of the stewardess' termination. In his November 1983 order, however, Judge Moran rejected the application of this principle to the claimants primarily on the ground that those stewardesses who resigned (as opposed to those who were discharged by United upon marriage) were similar to the nonapplicants in *Teamsters* who had the burden of proving that they were actual discriminatees and thus entitled to be treated like the rejected applicants who were presumptively entitled to relief.[2] Judge Moran then concluded that "the manner and burden of proof is

---

**2.** The plaintiff class has referred to the statement in *McDonald,* 587 F.2d at 360, that those stewardesses who were fired should be treated the same as those who resigned involuntarily. This statement is undoubtedly correct but does not conflict with the principle that resignees must carry the burden, in order to be considered class members, of proving that they did resign involuntarily. Once resignees achieve class status, they are and should be treated the same as those who were fired.

not the same for all the varying circumstances in Title VII cases. It must be tailored to the realities of the case, including how the evidence could or would be presented." In addition, however, he referred approvingly to the model "suggested, but not mandated," by the decision in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Much of the argument concerning the proper allocation of burdens centers on whether the case before us should follow the *Burdine* model, the *Teamsters* applicants model or the *Teamsters* nonapplicants model. *Burdine* set out a structure in which the plaintiff first establishes a prima facie case of discrimination which creates a factual presumption that the employer unlawfully discriminated. *Id.* at 254, 101 S.Ct. at 1094. The burden of producing evidence to rebut this presumption then shifts to the employer who must articulate a valid reason for having rejected the plaintiff. If the defendant meets this burden, then the burden of production shifts back to the plaintiff to show either that the employer was motivated by a discriminatory reason or that the proffered explanation is unworthy of credence. *Id.* at 254–56, 101 S.Ct. at 1094–95. The burden of persuasion, however, remains on the plaintiff to defeat the employer's showing of a nondiscriminatory reason.

As even Judge Moran recognized, the reference to *Burdine* in the present context is "insufficient and perhaps misleading." The entitlement hearings are clearly a different stage of proceedings than that at issue in *Burdine* because the former stewardesses need not carry any burden of proving that the defendant United Air Lines acted illegally. The illegal discrimination embodied in the "no-marriage" rule has been established and is no longer at issue. However, this prior adjudication did not, of course, identify exactly who was injured by this illegal conduct, and only those who were in fact injured are entitled to relief.

The issue presented by these entitlement hearings is thus much closer to the issue in *Teamsters* where the illegality of the challenged practice had also been previously determined than to *Burdine.* The issue in *Burdine,* of course, was whether discrimination had actually occurred. The issue in both *Teamsters* and the present case is the method to be used in determining who belongs to the plaintiff class, that is, who has been a victim of the proven discrimination. In *Teamsters,* the Court stated that those blacks who had applied for line-driver positions were presumptively to be treated as discriminatees. The employer could rebut the presumption only by showing that the applicant had been rejected for nondiscriminatory reasons. On the other hand, those who did not apply but claimed they were discouraged because of the employer's well-known discriminatory policy had to carry the burden of proving that they would have applied but for the policy.

The stewardesses who resigned their positions in temporal proximity to their marriages and who did not file union grievances or EEOC charges are in fact directly comparable to neither group in *Teamsters.* They are closer to actual discriminatees than the *Teamsters* nonapplicants because their contemporary inherent interest in and qualification for the position of stewardess (once marital status is removed from consideration) are unquestioned. On the other hand, unlike the *Teamsters* applicants or those stewardesses who were fired, it may be virtually impossible to know now what the actual intention and motivation of some stewardesses were at the time they resigned their positions. Of course, the claimants need only establish by a preponderance of the evidence that they resigned as a result of the rule.

The parties also dispute which *Teamsters* model is more applicable based on whether a resignation caused by the existence of the rule should be considered an employment decision of United Airlines or a decision of the former stewardesses. It is not necessarily useful to the analysis, however, to dwell on a characterization of a coerced resignation or a resignation in response to

the no-marriage rule as being the stewardess' own employment decision. It was, after all, the defendant's employment decision to have an illegal policy. The issue is only whether the illegal rule was the cause-in-fact of the resignation.

█ In the final analysis, it is perhaps most useful only to recall the maxim that each Title VII case may be unique to its own factual setting and therefore courts must be prepared to employ innovative procedural structures in facilitating the necessary determinations. *Burdine*, 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1093–94 n. 6.

█ In this connection, we do not need to consider the particulars of the Order of Reference because the meaning of paragraphs 4 and 5 seems abundantly clear and the class failed to object to the Order when it had ample opportunity to do so before the beginning of the individual hearings.[3] Judge Moran's subsequent order, despite the perhaps ambiguous references to the *Burdine* model, did not significantly change the allocation of burdens enunciated in the Order of Reference. Hence, to give the plaintiff class the relief requested from the November 1983 order would also require modification of the previous Order of Reference. To permit the plaintiffs to wait to challenge the Order until after several hundred hearings have been held and then to attempt to force rehearings on those claims which received adverse recommendations does not further the goal of efficient judicial administration. If, however, the plaintiffs had presented a direct and timely challenge to the allocation of the ultimate burden of proof in the Order of Reference, we would have had to consider carefully the principle that the proven wrongdoer must frequently bear the burden of persuasion. Insofar as the plaintiff class is instead challenging the manner in which the principles of the Order of Refer-

ence are *applied* in specific cases either by the masters or by Judge Moran, we must pursue a different line of analysis. We turn next to this problem.

## II

### A

As previously discussed, the Order of Reference places the initial burden of production on the claimant, who can establish her prima facie case by demonstrating a temporal link between her termination as a stewardess and her marriage. Paragraph 6, in addition, lists several factors, such as subsequent employment, which are considered probative of her intent to continue employment but for the no-marriage rule. Once the claimant has met her initial burden, the burden of production shifts to the defendant to rebut the factual presumption that the claimant resigned because of the rule, although the ultimate burden of persuasion remains on the claimant. The following discussion of appropriate procedures is not based on *Burdine*, which, as previously noted, specifically involved the liability phase. It is, instead, based on paragraphs 4 and 5 of the Order of Reference but uses the *Burdine* explanation of the shifting of burdens as a recent application of burden-shifting by the Supreme Court.

In *Burdine*, the Court stated that, once the burden of production shifted, the defendant needed only to articulate a legitimate, nondiscriminatory reason for rejecting the plaintiff. However, this explanation cannot be a mere pretext but, rather, "must be legally sufficient to justify a judgment for the defendant." 450 U.S. at 255, 101 S.Ct. at 1094. It must be based on admissible evidence and not merely an answer to the complaint or argument of counsel. *Id.* at 255 n. 9, 101 S.Ct. at 1094 n. 9.

---

**3.** By not reaching the merits of the Order of Reference, we need not express any opinion on the appropriateness of such a procedure in determinations of class membership in future Title VII cases. Given the unique characteristics of these claimants and their differences from the usual Title VII claimants in that they al-

ready held the employment positions which they wished merely to retain, the affidavit procedure originally suggested by the plaintiff class might conceivably have had some merit. However, the class did not and does not now challenge the use of adversary hearings and we thus see no error in adopting this procedure.

While creating fine distinctions about the allocation of burdens is often a pointless judicial exercise, in the present case, where the final determination often comes down to a "swearing match," the allocation of burdens may be decisive. It is therefore necessary to emphasize that where United and AFA have not come forward with any evidence—whether based on extrinsic factors such as the claimant's subsequent employment history or on impeachment through cross-examination of the claimant herself—the defendant will have failed to rebut the presumption established by the claimant's prima facie case.

■ A mere recitation of defendant's rote contention that the stewardess' resignation was not the result of the no-marriage rule or a general denial of the stewardess' factual allegations would not seem sufficient to meet the defendant's burden of production. The master, of course, can make a determination that the claimant's professed past intention to continue her employment is not credible. Nevertheless, the master's determination should be based on specific evidence adduced by United or AFA, whether by cross-examination or otherwise. If such evidence is not available in any form, then the master should conclude that the defendant has failed to meet its burden and thus also failed to rebut the factual presumption that the claimant's resignation was the result of the no-marriage rule.

Further, the masters and, in turn, the district court in adopting the findings of the masters are, of course, bound by the requirements of Fed.R.Civ.P. 52(a) and 53(e) that the court must find the facts specially and state its conclusions of law separately. These findings must be sufficiently complete to facilitate meaningful review by this court. *Kelley v. Everglades Drainage District,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943); *Rucker v. Higher Educational Aids*

*Board,* 669 F.2d 1179, 1183 (7th Cir.1982). Given the sometimes complex nature of the determinations required of the masters, despite the relatively simple character of the evidence involved, it is particularly useful for the masters to set out which facts they are relying on in reaching their conclusions.

B

Our review of the appeals of the nine individuals is confined to a determination whether the masters' findings are clearly erroneous, *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 927 (7th Cir.1984) (applying clearly erroneous standard of review to trial court's findings in Title VII case).[4] In certain instances, the masters' failure to make sufficient findings of the facts on which they relied or to adequately explain their conclusions requires remand. We have considered carefully the nine individual claims presented on this appeal. We address in detail three of these claims below and affirm the district court's disposition of the other six claims.

1. Barbara Thomas Notch, Claim No. 183. Ms. Notch flew for United Airlines from November 1963 to April 1968. She married on May 25, 1968. She was domiciled first in Washington, D.C., then in Los Angeles and, in September 1967, moved to Chicago O'Hare. From September to April, she lived with her parents near Milwaukee and commuted to O'Hare, working three days on, four days off. After her marriage, she lived in Pewaukee, Wisconsin, a small town west of Milwaukee with a similar commute to O'Hare. Upon her marriage she transferred to a ground position with United in Milwaukee but left that job because the hours were poor and she could not control her schedule as she had been able to as a stewardess. She then obtained full-time employment with a local bank. Her husband enjoyed sailing and

---

**4.** In *Nellis v. Brown County,* 722 F.2d 853, 859–60 (7th Cir.1983), this court subjected the district court's ultimate conclusion as to intentional discrimination in a Title VII case to searching review. We, however, distinguish *Nellis* because we are concerned here with purely factual determinations of causation, the ultimate determination that United's no-marriage rule was illegally discriminatory not being at issue at this time.

wanted her to have weekends off in order to sail with him.

The special master, in denying Ms. Notch's claim, referred only to her husband's desire that she have weekends off and to the fact that Ms. Notch did not protest the no-marriage rule and did not apply for unemployment compensation. She, of course, could not apply for unemployment compensation because she was employed virtually continuously after her resignation. Ms. Notch's commitment to the labor force appears obvious and her testimony that her desire to have weekends available could have been satisfied if she had been able to continue as a flight attendant was unrebutted. The fact that Ms. Notch did not lodge a contemporary complaint concerning the rule is, under the circumstances, only minimally probative and does not negate the other facts in the record.

 United Airlines apparently failed to present any evidence, even based on cross-examination of Ms. Notch, which would rebut the claimant's prima facie case and so did not meet its burden of production. The "free weekends" explanation was legally insufficient to rebut the claimant's prima facie case. On appeal, United Airlines has attempted to argue that Ms. Notch would not have been willing to commute from Pewaukee to O'Hare. However, she did commute that distance for approximately eight months, and there is nothing in the record to indicate that she would not have been willing to continue to do so after her marriage. Finally, during the hearing, United and AFA argued that Ms. Notch's inability to recall some of the details concerning her departure from United indicated that she did not resign because of the rule. However, it is not necessary for a claimant to recall all the details of what happened when she resigned, particularly when the established facts of her subsequent work record and other criteria remain unrebutted. In addition, the master did not find Ms. Notch's explanation of her intentions to be incredible. Hence, the master's conclusion appears unsubstantiat-ed by the evidence and our review of the record. We therefore conclude that the master's recommendation is clearly erroneous and reverse the denial of Ms. Notch's claim.

2. Lynne Runyon Overton, Claim No. 677. Ms. Overton flew for United from July 1965 to April 1, 1967. She was married a week after her resignation and moved to Anniston, Alabama for five months while her husband underwent infantry training. Before her resignation, Ms. Overton requested a transfer to a ground job with United in Birmingham, Alabama or Atlanta, Georgia. She also told her supervisor that she believed she must resign because of the no-marriage rule, although she did not protest the rule. In Anniston, Ms. Overton worked full-time for Sears, Roebuck and Company. Following her husband's departure for Vietnam, Ms. Overton returned to Los Angeles and obtained a ground position with United which she has held continuously until the present.

Again, Ms. Overton's commitment to the labor force appears unquestionable and, given the fact that her husband was overseas, there could be little issue whether her job as a flight attendant would have interfered with her married lifestyle. The only factor upon which the master seems to have relied in denying her claim is that it was uncertain whether Ms. Overton would have been successful in arranging for a personal leave of absence in order to accompany her husband to Alabama. Such leaves were available but were not automatically granted. Ms. Overton also testified that, if she could not obtain a leave, she would have arranged her schedule so as to have a maximum of days off during the five months that her husband was in Alabama.

Ms. Overton introduced evidence at her hearing that it would have been possible, although not certain, that she could have obtained a personal leave. The master, however, seems to have placed on her the burden of proving that she would have obtained the leave. United Airlines presented no evidence concerning its per-

sonal leave policy. In response to interrogatories requesting information about the leave policy, United and AFA answered that they had no such information. This question of whether Ms. Overton could have obtained leave appears to be an uncertainty which can never be resolved.

In *Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 289 (2nd Cir.1981), *cert. denied,* 445 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982), the nonofferees, like the claimants here, had the burden of proving that they applied to take the qualifying exam or would have but were deterred by the city's discriminatory policy. However, they did not have the burden of proving that they would have met the other requirements, such as physical and medical criteria. Rather, the defendant had the burden of proving that a candidate would not have been otherwise qualified or that there were no vacancies. While it would be difficult for the city to prove the nonofferees' past physical and medical condition based on the general unavailability of such data, the court concluded that the city had created this uncertainty and any such uncertainty should be resolved against it.

■ The question whether Ms. Overton would have been successful in obtaining a personal leave presents a comparable uncertainty which, because of United's rule, can never be resolved. However, this appears to be an uncertainty which, for legal purposes, should be resolved against the creator of that uncertainty.[5] Further, once the claimant met her burden of establishing a prima facie case, United apparently introduced no evidence, other than the cross-examination of the claimant, in its attempt to rebut the presumption that she would have continued working as a flight attendant. Her commitment to the labor force and her statement to her supervisor

stand as unrefuted and seemingly persuasive evidence of her intentions.

■ The only other factor relied on by the master was his observation of the witness' demeanor during her testimony. This somewhat conclusory statement leaves it unclear whether he simply disbelieved her testimony that she would have continued as a flight attendant or whether he found that she would not have been successful in obtaining the leave. Particularly in view of this statement, we cannot conduct a meaningful review of the master's conclusions and so remand this claim for more complete findings of fact either by the master or by the district court.

3. Marceilla Brown Brown, Claim No. 276. Ms. Brown worked for United Airlines from December 1964 to March 1968 and was married the next month. At the time of her marriage, she was domiciled in San Francisco, but she and her husband then moved to Kansas where they had both grown up. Ms. Brown testified, however, that they considered moving to Denver, which was a domicile city (that is, a city in which flight attendants were based), and having her conceal her marriage in order to keep flying. She rejected this course, however, for fear that, if discovered, United would fire her thus leaving a black mark on her employment record. She and her husband did move to Denver in 1973 and she applied then for a position as a flight attendant, although apparently as an "after-thought." In Kansas, Ms. Brown obtained full-time employment as a nurse's aid for several months but quit because she found the work depressing and unsatisfactory.

In rejecting Ms. Brown's claim, the master seems to have relied primarily on the Browns' move to Kansas and the impracticability of a commute from Kansas to a domicile city. Ms. Brown, however, never claimed that she would have attempted

---

**5.** We may contrast the master's apparent assumption in the decision on this claim with the assumption in other claims that women would have been able to obtain satisfactory maternity leaves of absence and thus would have continued their employment as flight attendants de-

spite the birth of children. *See, e.g.,* Claim No. 287 (Vol. 7, # 1272). The resolution of such an uncertainty in the claimant's favor seems to be the correct result in terms of comparable Title VII decisions and general considerations of equity.

such a commute. On the other hand, the master does not seem to have considered Ms. Brown's assertion that she would have moved to Denver if she could have stayed on in her flight attendant position or that the Browns did in fact later move to Denver where her husband was able to find satisfactory employment. The master also never made any finding concerning Ms. Brown's claim that she called United to inquire about reinstatement when she learned that the no-marriage rule had been abolished.

■ While the masters are not required to give detailed findings concerning every factual allegation made by a claimant, it seems that, in this case, the master neither considered nor made findings about the central thesis of the claimant's allegations and, instead, considered and rejected a theory never propounded by the claimant. The denial of this claim must therefore also be remanded for further consideration and additional findings of fact. *See Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1183 (7th Cir.1982) (district court's decision remanded for inadequate findings because judge failed to discuss other evidence presented by plaintiff).

■ Perhaps running as a thread through the nine specific claims on appeal is the sense that often the masters' conclusions may be insufficiently explained or inadequately supported by the facts in the record. While these cases may be routine to the masters, who are conducting hundreds of these hearings, the masters and the district court must keep in mind that an appellate court may eventually be called upon to review the sufficiency of the findings and their support in the record as well as other questions of law. Even under the "clearly erroneous" standard of review, an appellate court requires adequate findings and an explanation to make its review meaningful.

In addition, it is not enough to reiterate that the burden of proof remains on the claimant throughout the hearing. This is clear from the Order of Reference. The masters must keep equally in mind that United has a distinct burden to introduce evidence rebutting the factual presumption created by the claimant's prima facie case. This means that, if United fails to introduce evidence, the master cannot simply reject the claim unless the master makes a clear credibility determination which negates the claimant's assertion that she would have continued her employment as a stewardess but for the no-marriage rule. Once the claimant establishes a prima facie case and United fails to rebut it by admissible evidence, even under the *Burdine* standard the master's denial of the claim cannot stand. The mere numbers of these hearings should not deter the district court from demanding adherence to the requirements of both sufficiency of findings and an adequate basis in law and fact for the masters' ultimate conclusions.

We therefore affirm in part, reverse in part and vacate and remand in part for further proceedings not inconsistent with this opinion. Each party shall bear its own costs. Circuit Rule 18 shall not apply.

ESCHBACH, Circuit Judge, concurring in part and dissenting in part:

I concur in that part of the court's opinion which affirms the district court's allocation of the burdens of proof and production. I write separately only to express my view that, in light of this court's decision not to review the merits of the Order of Reference, any discussion of what we might have done in the first instance, or what we might have considered had we reviewed the Order, is unwise and might serve as the impetus to protract further these already protracted proceedings.

I also concur in the court's resolution of eight of the nine individual claims before us. However, because I cannot find that the Special Master's resolution of the Overton claim is clearly erroneous, I dissent from that part of the opinion which directs that the Overton claim be remanded.

Ms. Overton testified that she delayed marriage until it was almost certain that her fiance, who had enlisted in the service, would be sent to Vietnam. When it became clear that her fiance would see combat, Ms. Overton resigned from her stewardess job, married, and moved to Anniston, Alabama, where she remained with her husband until he was sent overseas five months later. The Special Master found that Ms. Overton and her fiance "decided to get married as soon as possible, decided that Claimant would resign her position ... and that she would travel to Anniston ...," and based on her testimony and demeanor, determined that she had resigned in order to spend the remaining months with her new husband.

At her hearing, Ms. Overton testified that, had there been no discriminatory rule, she would have applied for a leave of absence or traded trips with other stewardesses in order to spend some time with her husband. On cross-examination, Ms. Overton admitted that she did not know what United's policy was with respect to personal leaves, and that she thought they were available for only 90 days. Moreover, she admitted that she had been unable to trade trips very often during the period before she married. The majority believes that the Special Master unfairly required Ms. Overton to demonstrate that she would have been able to obtain a personal leave had she requested one. I believe, however, that the Special Master viewed Ms. Overton's inability to reconstruct how she could have reconciled both her responsibilities to her job and her desire to spend the remaining few months with her husband as bearing adversely on her credibility. My view is consistent with the Special Master's finding that Ms. Overton and her husband decided that she should resign and move. Unlike the majority, I do not believe that there is any requirement that the Special Masters make express credibility determinations when it is clear that the facts as found by the Master cannot be reconciled with the claimant's testimony about what she would have done absent the rule.