In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-3430

M. AKIFUR RAHMAN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

MICHAEL CHERTOFF, Secretary
of Homeland Security, *et al.*,

*Defendants-Appellants*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 3761—**Ronald A. Guzmán**, *Judge*.

———————

ARGUED MAY 13, 2008—DECIDED JUNE 26, 2008

———————

Before EASTERBROOK, *Chief Judge*, and KANNE and TINDER,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*. Plaintiffs seek to represent
a class of citizens who have been delayed in reentering
the United States from abroad as a result of watch lists
maintained by the Department of Homeland Security.
Persons on these lists are screened with special attention.
Some plaintiffs contend that they should not be on a
list, because they do not pose any threat of terrorism or
other unlawful acts. Other plaintiffs maintain that, if
they are to be listed, they should be in a low-threat classifi-

cation. Still others contend that they are not on a list but have been mistaken (because of similar or identical names) for persons legitimately listed. All plaintiffs contend that the Department and the FBI should take more, and more effective, steps to remove from the lists persons who (in plaintiffs' view) should not be there, and find better ways to distinguish among persons with similar names or other characteristics. Defendants are improving identification by requiring passports at more places of entry and introducing passports with biometric data, but plaintiffs are displeased with the details of these programs.

According to plaintiffs, undue delay in allowing a citizen to reenter the United States violates the Constitution. Plaintiffs also believe that the Constitution forbids frightening steps, such as pointing weapons at travelers whose activities arouse suspicions. These propositions are questionable.

> The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Congress, since the beginning of our Government, "has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the intro-

duction of contraband into this country." [*United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)] (citing *Ramsey*, *supra*, at 616–617 (citing Act of July 31, 1789, ch. 5, 1 Stat. 29)). The modern statute that authorized the search in this case, 46 Stat. 747, 19 U.S.C. § 1581(a), derived from a statute passed by the First Congress, the Act of Aug. 4, 1790, ch. 35, § 31, 1 Stat. 164, see *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 (1983), and reflects the "impressive historical pedigree" of the Government's power and interest, *id.*, at 585. It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity.

*United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) (footnote omitted). The Court held in *Flores-Montano* that the United States is entitled to stop, and disassemble, any car or truck entering the United States at the border, without particularized suspicion. The delay occasioned by the sort of search approved in *Flores-Montano* often must exceed the delay about which plaintiffs complain. See also, e.g., *United States v. Arnold*, 523 F.3d 941 (9th Cir. 2008) (border agents do not need particularized suspicion to search the contents of a computer's hard drive for child pornography or other criminal activity).

Notwithstanding the Supreme Court's decisions approving suspicion-free stops and searches at the border, the district court denied defendants' motion to dismiss the suit. 244 F.R.D. 443 (N.D. Ill. 2007). The district judge observed that especially intrusive searches, such as those of body cavities, require person-specific suspicion, and it generalized from that to the proposition that any

"nonroutine" search or detention must be justified by a reliable and accurate record-keeping system. That is hard to reconcile with *Flores-Montano*, which rejected the ninth circuit's conclusion that all nonroutine border searches require justification. See 541 U.S at 152–53. The Executive Branch has broad authority to stop goods and persons at the border to gather information and ascertain the propriety of the proposed entry. Stops that entail intrusive searches of the body are in a special category, but this case does not concern them. As the Court wrote in *Flores-Montano*, "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person" do not carry over to other kinds of stops. 541 U.S. at 152.

The district court's decision has opened the door to discovery and sparked a debate about the application of the state-secrets privilege. See 2008 U.S. Dist. LEXIS 32356 (N.D. Ill. Apr. 16, 2008) (Schenkier, M.J.). Our concern today is not the district court's refusal to dismiss the suit—a decision that is interlocutory and not yet reviewable, given the lack of certification under 28 U.S.C. §1292(b)(1)—or the scope of the state-secrets privilege, but the court's decision to certify two nationwide classes.

Plaintiffs want the district court to superintend the process of inspecting persons who present themselves at the border for entry. Plaintiffs think that an injunction should cover just about every aspect of entry procedure, from the degree of suspicion required for inquiry, the way officials try to determine a person's identity (a difficult task, since those arriving by car do not require passports, and even those documents can be forged or altered), and how the FBI communicates its decision to close

investigative files, to details about bathrooms and food service in rooms where arriving travelers wait for questions or inspections. Plaintiffs say that the Constitution requires federal officials to notify the travelers' relatives about the likely duration of delay in entry. According to plaintiffs, the Constitution requires defendants to adopt most, if not all, of the proposals that the Department of Justice's Inspector General made in two recent reports. See *Follow-up Audit of the Terrorist Screening Center* (September 2007) (Audit Report 07–41); *Audit of the Terrorist Watchlist Nomination Process* (March 2008) (Audit Report 08–16). Plaintiffs want the response to these reports taken out of the Executive Branch's hands. And the best way to do that, plaintiffs believe, is via an injunction covering large classes.

The district court has certified two classes. The "Primary Traveler Class" is "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs." The "Family Detainee Class" is "All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class." The class definitions do not specify what "defendants' contested policies, practices and customs" are. But the consequence of this approach is that, every time plaintiffs file a brief or motion, membership in the classes may change. Defendants find the definitions unsatisfactory. They sought, and we granted, permission for interlocutory appeal under Fed. R. Civ. P. 23(f).

It isn't hard to see problems with these class defini-
tions.

- The classes grow or shrink with the plaintiffs' con-
  tentions as the case progresses.

- The word "detention" is undefined and could mean
  anything from "stopped for 60 seconds to present a
  passport" to "held incommunicado for more than a
  day".

- Even in retrospect the court will not know who is in
  the class and who is not, because the state-secrets
  privilege is bound to cover some of the "contested
  policies, practices and customs" and some of their
  applications to some travelers.

- For these and other reasons it is impossible to tell
  whether all of the named plaintiffs are (or will be at
  the end of the case) members of the classes they
  purport to represent. And it may turn out that the
  judges are in the class, and should have disqualified
  themselves, but didn't know it.

- It is also uncertain whether any particular challenged
  practice has affected any particular named plaintiff,
  and whether at least one named representative plain-
  tiff has standing to challenge each practice that
  eventually becomes contested.

- If plaintiffs prevail, framing relief is apt to require
  person-specific decisions (such as "persons X and Y
  shouldn't be on the list" or "defendants must give
  person Z a credential that will be good enough to
  ensure that agents don't confuse him with person Q,
  who is properly on the list") that would be more
  appropriate to individual actions.

Plaintiffs acknowledge that the classes' membership will be hard to pin down but insist that this is irrelevant because the district court certified them under Rule 23(b)(2) rather than Rule 23(b)(3). Members of a Rule 23(b)(2) class do not receive notice and can't opt out. As plaintiffs conceive things, classes just make the suit a vehicle for nation-wide injunctive relief; their scope is unimportant. They point to language in the Advisory Committee Note to the 1966 amendments of Rule 23—the Committee said that "in the civil-rights field" the fact that a class's mem-bership is "incapable of specific enumeration" does not prevent certification—and the fact that this court approved an open-ended class definition in *Alliance to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir. 1977).

A class of "all current and future employees of Corpora-tion D" (which is said to discriminate on account of race)—the sort of class to which the Committee Note refers—is more concrete than the classes certified here. Its members could be enumerated eventually. The suits contemplated by the Note don't involve shifting claims or state-secret privileges, which prevent enumeration even with all-out effort.

The Advisory Committee's Note led many courts to certify what they called "across-the-board classes", defined to cover all of the defendants' challenged prac-tices whether or not the nominal representatives had been injured by a particular practice. The Supreme Court disapproved across-the-board classes in *General Telephone Co. v. Falcon*, 457 U.S. 147 (1982), and *Falcon* shows that the classes certified here are untenable. The Court held that the certified class must correspond to the injuries received by the representative plaintiffs. A class of all persons now or in the future subject to unspecified prac-

tices may have nothing to do with the named representatives' injuries, or what caused them.

*Alliance to End Repression* is a relic of a time when the federal judiciary thought that structural injunctions taking control of executive functions were sensible. That time is past. The decrees issued in that case have been vacated, in decisions that also demonstrate the impropriety of certifying open-ended classes to facilitate structural injunctions designed to regulate law-enforcement practices. See, e.g., *Alliance to End Repression v. Chicago*, 742 F.2d 1007 (7th Cir. 1984) (en banc); *Alliance to End Repression v. Chicago*, 237 F.3d 799 (7th Cir. 2001).

The classes certified in this case are equivalent to a class of "all persons in the United States who have been, or ever will be, stopped without probable cause" certified in an effort to take control of how the police investigate crime and make arrests. Improper arrests are best handled by individual suits for damages (and potentially through the exclusionary rule), not by a structural injunction designed to make every error by the police an occasion for a petition to hold the officer (and perhaps the police department as a whole) in contempt of court. Just so with stops at the border.

Classes of the sort certified in this case are incompatible with Rule 23(a)(3), which says that a class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class". As we've said, no one knows whether the representatives are even in the classes the district judge defined, let alone whether their claims are "typical." See also *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir. 2002). What's more, a class may be certified under Rule 23(b)(2) only if "the party

opposing the class has acted or refused to act on grounds that apply generally to the class". The "general application" of practices to be specified later—and that when specified may turn out to affect only subsets of the class, which may or may not include any named representative—is hard to evaluate.

The classes here are so ambulatory that plaintiffs might as well have proposed a class comprising "We the People of the United States". The expansive nature of that class (and of the two classes actually certified) shows that the case presents issues more suited to resolution by the democratic process than to adjudication. How much time returning travelers should spend cooling their heels at the border, while agents try to determine whether they are who they claim to be, and have been where they claim to have been, are legislative or executive questions. The political process is receptive to citizens who are abused by bureaucrats. The FBI and Department of Homeland Security have agreed to implement many of the Inspector General's suggestions (though not as many, or as fast, as plaintiffs think they should).

The problem (from plaintiffs' perspective) may be that Congress and the President worry at least as much about false negatives—that is, people who should be on a watch list but aren't—as about false positives (people who are on the list but shouldn't be, and people who aren't on the list but are mistaken for someone who is). Judges are good at dealing with false positives, because the victims come to court and narrate their grievances, but bad at dealing with false negatives, which are invisible. Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives.

Political rather than judicial actors should determine the terms of trade between false positives and false negatives. Delays depend not only on technology (do passports include biometric data, and, if so, subject to what safeguards?) and other political choices (which entrants require passports?) but also on the size of the staff assigned to screen travelers. Only Congress can authorize the hiring of additional agents in order to reduce waiting time or provide extra backup. One plaintiff says that a nervous border agent drew a gun unnecessarily and embarrassed him before his family; a larger staff would leave fewer agents fearful for their own security—but at any given staff size an injunction telling agents to be calm and patient would be a waste of paper.

Plaintiffs are entitled to relief that will redress any discrete wrong done them. That can be accomplished without certifying a class. There is no risk that the defendants can moot the litigation by offering compromises to all named plaintiffs. Defendants have shown no inclination to do so, and the strategy could not work, because other travelers could intervene to carry on. Decisions favorable to particular plaintiffs will have their effect in the normal way: through the force of precedent. If this seems a modest vision of the judiciary's role, we answer that modesty is the best posture for the branch that knows the least about protecting the nation's security and that lacks the full kit of tools possessed by the legislative and executive branches. Presidents, Cabinet officers, and Members of Congress can be dismissed by the people if they strike an unwise balance between false positives and false negatives, between inconvenience today and mayhem tomorrow; judges are immune from that supervision and must permit those who bear the blame for

errors (in either direction) to assume the responsibility for management.

REVERSED AND REMANDED