In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-2741 & 09-3274

JAMIE S., on her own behalf and on behalf
of a class of similarly situated persons, et al.,

*Plaintiffs-Appellees/*
*Cross-Appellants,*

*v.*

MILWAUKEE PUBLIC SCHOOLS, et al.,

*Defendants-Appellants/*
*Cross-Appellees.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 928—**Aaron E. Goodstein**, *Magistrate Judge.*

ARGUED SEPTEMBER 7, 2010—DECIDED FEBRUARY 3, 2012

Before FLAUM, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. We are asked in these consolidated appeals to review multiple procedural and substantive orders in a long-running class-action lawsuit seeking

structural reform of special education in the Milwaukee public school district. Under the Individuals with Disabilities Education Act (the "IDEA" or "the Act"), 20 U.S.C. §§ 1400 *et seq.*, the States receive federal funding for the education of disabled children on the condition that their local school districts comply with the procedural requirements of the Act and provide a "free appropriate public education" to all resident children with disabilities. *Id*. § 1412(a)(1)(A). As relevant here, local districts must identify children with disabilities, determine whether these children require special-education services, and develop individualized education programs ("IEPs") tailored to each student's specific needs. Each step in the process is highly individualized because every child is unique.

In 2001 seven students with disabilities sued the Milwaukee Public Schools ("MPS") and the Wisconsin Department of Public Instruction ("DPI") on behalf of themselves and a class of "all school age children with disabilities who reside in the Milwaukee Public School District boundaries and who are or may be eligible for special education and related services under IDEA and Wisconsin law." The complaint alleged widespread violations of the IDEA touching on nearly every aspect of MPS's implementation of the Act. The district court rejected the plaintiffs' ambitious proposed class but certified a somewhat more modest one: students eligible to receive special education from MPS "who are, have been or will be" denied or delayed entry into or participation in the IEP process. This narrower class definition had the effect of focusing the case on alleged violations

of the so-called "child find" requirements of the IDEA. *Id.* § 1412(a)(3)(A).

The district court held a bench trial and found MPS and DPI liable for various "systemic" IDEA violations. DPI then settled with the class by agreeing to order MPS to meet certain compliance benchmarks; the district court approved the settlement over MPS's objection. On June 9, 2009, the court ordered a complex remedial scheme requiring MPS to set up a court-monitored system to identify disabled children who were delayed or denied entry into the IEP process, implement "hybrid" IEP meetings, and craft compensatory-education remedies.

MPS appealed the remedial order and also challenged the district court's class-certification decision, the liability order, and the approval of the DPI settlement. The plaintiffs sought review of the order rejecting their sweeping class definition but missed the filing deadline for a cross-appeal. On August 19 the district court issued two follow-up orders appointing an independent monitor and approving the class notice. The plaintiffs appealed from these orders but do not contest either decision; instead, they ask us to review the order denying their original class-certification motion.

Both sides moved to dismiss on jurisdictional grounds. We took the motions with the merits and now dismiss the plaintiffs' appeal. The orders from which the plaintiffs appealed are not final orders; nor are they the equivalent of injunctions, so they do not qualify for immediate appeal under 28 U.S.C. § 1292(a)(1). Moreover, the plaintiffs are attempting a flagrantly improper procedural

maneuver; they may not revive their untimely appeal by appealing from orders they do not want reviewed. We deny the motion to dismiss MPS's appeal. The June 9 remedial order is the functional equivalent of an injunction and may be immediately appealed under § 1292(a)(1); we have pendent appellate jurisdiction over the related orders.

On the merits we vacate the class-certification order. Like the Title VII claims in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the IDEA claims in this case are highly individualized and vastly diverse, making this case unsuitable for class-action treatment under Rule 23 of the Federal Rules of Civil Procedure. The class itself is fatally indefinite, the claims lack the commonality required by Rule 23(a)(2), and it's not possible to order final injunctive or corresponding declaratory relief on a class-wide basis, as required by Rule 23(b)(2). Because the class should not have been certified, the liability and remedial orders must be vacated as well. Finally, DPI's settlement with the class prejudiced MPS's legal rights by requiring more of MPS than DPI had the statutory authority to demand. In any case, because the class was certified in error, the order approving the DPI settlement must also be vacated.

## I. Background

### A. Legal Framework

The IDEA requires participating States to provide to all disabled students a "free appropriate public education."

20 U.S.C. § 1412(a)(1)(A). Complying with this requirement is a complex and inherently child-specific undertaking. First, the IDEA requires that "[a]ll children with disabilities residing in the State . . . and who are in need of special education and related services" be "identified, located, and evaluated," a process known as "child find." *Id*. § 1412(a)(3)(A). Once a disabled child in need of special education is identified, the local school district must evaluate the child's specific needs and develop an "individualized educational program," or "IEP," outlining the particular special-education services that are necessary to allow the child to learn in the "least restrictive environment." *Id*. §§ 1412(a)(4)-(5), 1414. The content of an IEP and the meaning of "least restrictive environment" are nuanced topics that we need not explore here. With limited exceptions, an "IEP Team" must be convened and meet within 90 days of the child's initial referral, *see* WIS. STAT. § 115.78(3)(a) (1998);[1] the IEP Team must include various educational professionals and the child's parent or guardian, *see* 20 U.S.C. § 1414(d)(1)(B). Once an IEP is in place, the school must provide the services listed in it, and the IDEA sets out many rules governing the process of amending an IEP. These topics, too, are beyond the scope of inquiry here.

To ensure that each disabled child receives a free appropriate public education, the IDEA also requires States to provide various procedural safeguards to stu-

---

[1] The statutory time frame has since been shortened to 60 days. *See* WIS. STAT § 115.78(3)(a).

dents and parents. *See id*. § 1415. A parent may file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child," *id*. § 1415(b)(6)(A), and may request an impartial due-process hearing to resolve the complaint, *id.* § 1415(f). After receiving a final decision from the hearing officer, the parent may appeal to the state educational agency. *Id.* § 1415(g). Finally, a still-aggrieved parent may file a civil action seeking review of the decision. *Id*. § 1415(i)(2). The IDEA also requires that parents be given notice of their procedural rights at various times, including when the school district first proposes or refuses to evaluate a child for a disability. *Id*. § 1415(b)(3), (c)(1).

Wisconsin implements the IDEA through sections 115.758-115.90 of the Wisconsin Statutes, which track the IDEA's requirements while adding functional detail. One provision of particular importance here, section 115.90, gives DPI—the state educational agency charged with overseeing Wisconsin's IDEA compliance—various enforcement mechanisms if individual schools or school districts are not fulfilling their statutory obligations. Specifically, DPI may order a school district to submit a "corrective plan" that addresses the area of noncompliance, withhold state funding until the violation is fixed, or if the first two methods are unsuccessful, ask the state attorney general to bring a lawsuit against the school district to force compliance. WIS. STAT. § 115.90.

**B. Proceedings Below**

The procedural history of this case is lengthy and complex; we will simplify where we can. In 2001 Jamie S. and six other named plaintiffs brought this class-action suit against MPS and DPI alleging a host of IDEA violations. Jamie is cognitively impaired and was at that time an eight-year-old student in an MPS school. The other named plaintiffs are (or were) MPS students with disabilities ranging from deafness to Asperger's syndrome to various emotional disturbances. The parties consented to the jurisdiction of a magistrate judge, *see* 28 U.S.C. § 636(c)(1), and the plaintiffs moved to certify a class of all Milwaukee-area students who "are or may be eligible for special education and related services under IDEA and Wisconsin law due to their disabilities." The magistrate judge declined to certify a class of this scope based largely on concerns about exhaustion of administrative remedies. But the judge believed that some of plaintiffs' claims could be litigated as a class notwithstanding their failure to exhaust administrative remedies.

To that end, the judge divided the proposed class into two categories: those having "pre-determination claims" and those having "post-determination claims." These were terms of the court's own creation and referred to IDEA violations arising *before* an IEP meeting takes place and IDEA violations arising *after* an IEP takes place. Although the IDEA generally requires plaintiffs to use the administrative dispute-resolution process before filing suit, the judge thought that exhaustion of

administrative remedies for "pre-determination claims" would be futile because parents of children with these kinds of claims might not know they have a right to administrative review. For this reason the judge excused, on a class-wide basis, the failure to exhaust administrative remedies for pre-determination claims. On the other hand, the judge thought that parents who had attended an IEP meeting would understand their right to administrative review. Accordingly, the judge held that the administrative system is adequate for post-determination claims and declined to excuse the exhaustion requirement for this category.

This approach meant the plaintiffs could litigate their pre-determination claims as a class, but their post-determination claims had to proceed individually (or not at all if administrative remedies had not been exhausted). Accordingly, the judge invited the plaintiffs to try again at class certification using the court's pre-determination/post-determination distinction. After two more rounds of briefing, the judge settled on his own class definition. On November 14, 2003, the court entered an order certifying the following class:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

Following class certification and several years of discovery, the court conducted a two-phase bench trial on

liability. In Phase I the court heard testimony from experts regarding MPS's and DPI's compliance with the IDEA. Satisfied that a full trial was warranted, the court conducted lengthy Phase II proceedings in which the parties presented further evidence regarding the basis for the experts' opinions. In a written decision issued on September 11, 2007, the court found both MPS and DPI liable for "systemic" violations of the child-find require-ments of the IDEA. Specifically, the court found that from September 2000 to June 2005, MPS committed the following IDEA violations on a system-wide basis: it failed to identify children with suspected disabilities and refer them for evaluation within the statutory 90-day time frame; improperly extended the 90-day time frame; imposed suspensions in a way that frustrated disability referrals; and failed to ensure that parents attended IEP meetings. The court also found that DPI failed in its oversight duties.

The court based its liability findings primarily on the opinion testimony of Dr. Diana Rogers-Adkinson, a special-education professor at the University of Wisconsin-Whitewater who served as the plaintiffs' primary expert. She reviewed approximately 200 MPS student files but engaged in no statistical analysis or other accepted analytical method to determine whether any particular violation of the IDEA could properly be characterized as "systemic." Instead, she based her opinion entirely on "patterns" or "trends" she observed in the student files. During the time period in question, MPS annually enrolled 95,000 to 97,000 students, ap-proximately 16,000 of whom were eligible for special

education every year. Dr. Rogers-Adkinson did not explain how a review of 200 student files could yield a conclusion that MPS was in systemic violation of the IDEA during the relevant five-year period.

Indeed, the court's 64-page liability order does not contain any analysis subjecting Dr. Rogers-Adkinson's testimony to the standards applicable to expert witnesses under Rule 702 of the Federal Rules of Evidence. To the contrary, the court expressly acknowledged that her opinion was *not* based on any scientific method but instead rested on what she loosely termed a "qualitative analysis" of the student files she reviewed. After identifying "certain patterns" and "trends" in the student files, Dr. Rogers-Adkinson simply "projected" the patterns and trends "over the entire MPS district" and said she "believe[d] . . . the same trends would appear if a scientific or true random sampling of files had been conducted." Without mentioning the requirements of Rule 702, the court summarily accepted Dr. Rogers-Adkinson's methodology as an adequate factual foundation for finding MPS in systemic violation of the IDEA: "The court accepts the qualitative analysis methodology used by Dr. Rogers-Adkinson. The court further accepts her Child Find trends or patterns and applies them system wide to MPS."

In response to the court's liability order, DPI entered into settlement negotiations with the plaintiff class and eventually presented a settlement agreement to the court for approval. We will describe it in more detail later, but in brief, DPI agreed to order MPS to meet

various compliance benchmarks within a certain time frame and to pay for an independent monitor to oversee MPS's performance. In exchange the plaintiff class dismissed its claims against DPI and gave away the rights of class members to bring representative suits against DPI for IDEA violations predating the agreement. Over MPS's vigorous objection, the district court approved the settlement.

The case then proceeded to the remedial phase of the trial against MPS alone. The court heard evidence and argument on possible remedies, and on November 17, 2008, ordered the parties to submit posttrial briefs regarding their final remedial proposals. This order included two pages of detailed questions, the answers to which informed the content of the parties' final proposals. For example, the court directed the parties to address how putative members of the class were to be evaluated for inclusion in the class; how individual liability and compensatory-education determinations should be made; which party should prevail when the evidence is inconclusive; how disputes between the parties should be resolved; and who should pay for the dispute-resolution process. The parties submitted briefs outlining their preferred remedies and responded to each other's proposal.

On June 9, 2009, the court issued a lengthy order setting forth an elaborate court-monitored remedial scheme. The court ordered both general and specific class notice designed to reach the parent or guardian of as many potential class members as possible. Recipients would

identify their children as potential class members by submitting response forms that would initiate a process of professional evaluation to determine whether or not the child was a member of the class. The court ordered the creation of a "hybrid" IEP team, closely resembling the IEP team required by the IDEA but including a court-appointed independent monitor to oversee its operation.

The hybrid IEP team was charged with evaluating the responses to the class notice to determine how to proceed in each individual case. In some cases it might be obvious that the child is not disabled, and no further evaluation would be required. In others a professional evaluation would be required to determine whether the child has a disability. In others a full IEP meeting would be needed to determine whether the child requires special-education services in order to receive a free appropriate public education. And finally, in some cases the child might be entitled to compensatory education— a remedy available under the IDEA—to compensate for a past denial of a free appropriate public education. The hybrid IEP team was given the authority to grant compensatory-education awards, subject to the court's oversight. The estimated cost to MPS to implement this remedy: between $11.5 and $40 million, depending on how many parents responded and the extent of the compensatory education awarded to qualifying children.

The June 9 remedial order also rejected some of the remedial proposals made by the parties. For example, the judge rejected the plaintiffs' request for a segregated compensatory-education fund and for "parent advocates"

separate from the independent monitor and denied MPS's request for a binding-arbitration system to resolve disputes. Finally, the court ordered the parties to negotiate regarding the independent monitor and the form of the class notice. If they could not agree, the parties were to submit nominations for the independent monitor and a proposed class-notice form.

MPS appealed the June 9 remedial order and also sought review of the court's class-certification decision, the liability order, and the court's order approving the DPI settlement. The plaintiffs sought review of the district court's rejection of their original class definition but missed the deadline for filing a cross-appeal. In the meantime the parties could not agree on an independent monitor or class-notice form, so they submitted competing proposals on these two follow-on matters.

On August 19, 2009, the court entered an order naming the independent monitor and charging her with the responsibility of "implement[ing] the remedy set forth within" the June 9 order. This brief order also summarizes the independent monitor's duties, explains how she is to be paid, and provides some detail about how she would interact with the parties and the court. In a second order issued on August 19, the court approved the class-notice form and explained how it should be distributed.

The plaintiffs appealed the August 19 orders, but they have no quarrel with the substance of these decisions. That is, they do not disagree with the judge's choice of an independent monitor or the form of the class notice. Instead, they ask us to review the denial of their original class-certification motion.

Both sides moved to dismiss the other's appeal for lack of jurisdiction. MPS also moved to stay the June 9 remedial order pending resolution of its appeal. We consolidated the cases, stayed the remedial order, and asked the parties to brief the jurisdictional questions along with the merits.

## II. Discussion

These consolidated appeals raise important procedural and substantive issues regarding the suitability of IDEA claims for class certification, the kind and degree of evidence necessary to find a local school district in systemic violation of the IDEA, and the propriety of a federal-court takeover of a school district's special-education program as a remedy for individual IDEA violations. We begin, however, with jurisdictional issues.

## A. Jurisdiction

Both appeals claim appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which permits immediate appeal from an interlocutory order "granting, continuing, modifying, refusing or dissolving" an injunction. Section 1292(a)(1) "creates an exception from the long-established policy against piecemeal appeals," but "[t]he exception is a narrow one and is keyed to the 'need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence.'" *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480 (1978) (quoting *Balt. Contractors v. Bodinger*, 348 U.S. 176, 181 (1955)).

Accordingly, mandatory interlocutory orders are considered injunctions reviewable under § 1292(a)(1) "only if they effectively grant or withhold the relief sought on the merits and affect one party's ability to obtain such relief in a way that cannot be rectified by a later appeal (that is, 'irreparably')." *In re City of Springfield, Ill.*, 818 F.2d 565, 567 (7th Cir. 1987) (citing *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377-79 (1987), and *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)). Stated differently, "[a]n order . . . is properly characterized as an 'injunction' when it substantially and obviously alters the parties' pre-existing legal relationship." *Jones-El v. Berge*, 374 F.3d 541, 544 (7th Cir. 2004) (citing *Gautreaux v. Chi. Hous. Auth.*, 178 F.3d 951, 958 (7th Cir. 1999)).

The parties agree that by ordering the creation of the hybrid IEP system, the district court granted an injunction within the meaning of § 1292(a)(1), but they disagree about which order achieved that result. MPS appealed from the June 9 remedial order and contends that this order is the functional equivalent of an injunction. The plaintiffs argue that MPS's appeal was premature. They maintain that the remedial order did not fully "ripen" into an appealable injunction until the district court appointed the independent monitor and approved the class notice on August 19.

The plaintiffs direct our attention to *Sherpell v. Humnoke School District No. 5*, 814 F.2d 538, 539-40 (8th Cir. 1987), and *Groseclose v. Dutton*, 788 F.2d 356, 361 (6th Cir. 1986), both of which held that an order requiring parties to submit proposed remedial plans is generally not an

injunction for purposes of § 1292(a)(1). In our decision in *Springfield*, we agreed with that general principle: "[O]nly directives awarding the relief plaintiffs seek or putting the case on a collision course with that relief are 'injunctions' under § 1292(a)(1)." 818 F.2d at 568. The plaintiffs insist that the June 9 order was merely an order to formulate proposals for the independent monitor and class notice and that it was only after the August 19 orders appointing the monitor and approving the class notice that the hybrid IEP system was truly in place.

This characterization of the June 9 order is disingenuous. It's true that the court directed the parties to consult with each other about the identity of the independent monitor and the form of the class notice, and to submit proposals if they could not agree. But the bulk of the court's 71-page order was devoted to evaluating the comprehensive remedial proposals the parties had *already submitted* and explaining the elaborate remedial scheme the court had crafted. The order established in fine detail the remedial program MPS was required to implement—a scheme designed to produce individualized compensatory-education awards, the ultimate relief sought in the case.

Although the June 9 order left the identity of the independent monitor and the content of the class notice to be worked out by the parties, MPS's obligations were not contingent on those details. Whoever the monitor, and whatever the form of the class notice, the June 9 order required MPS to create a massive identification and

evaluation system consuming significant educational resources and costing millions of dollars. Even if the hybrid IEP system could not begin operating until the independent monitor was appointed and the class notice was approved, the June 9 order gave the plaintiffs the relief they were seeking and substantially altered MPS's legal rights. The remedial order is the functional equivalent of an injunction for purposes of § 1292(a)(1). *See Springfield*, 818 F.2d at 568. We have jurisdiction over MPS's appeal; the plaintiffs' motion to dismiss is denied.

In contrast, the plaintiffs' jurisdictional argument in support of their own appeal is at best inconsistent and at worst incoherent. The plaintiffs initially tried to cross-appeal from the June 9 remedial order, seeking review of the denial of their original class-certification motion. But they missed the filing deadline, so they tried a different route to get their preferred class definition before this court: They appealed the August 19 orders appointing the independent monitor and approving the class notice, insisting that *these* orders are the "injunction" for purposes of § 1292(a)(1). They are not. Unlike the June 9 order, the August 19 orders do not grant relief on the merits or substantively alter the parties' legal relationship. *See Jones-El*, 374 F.3d at 544; *Springfield*, 818 F.2d at 567. They do not require the parties to do or refrain from doing anything *at all*. The district court had already announced the remedial scheme in the June 9 order, including the appointment of an independent monitor and the requirement of general and specific class notice. All that remained was to decide the identity of the monitor and approve the form of the

class notice. These details were surely important, but resolving them did not amount to an appealable injunction. *Cf. Jones-El*, 374 F.3d at 544 ("[A]n unappealable order is one that interprets or clarifies a prior order and does not create new rights or obligations independently enforceable through a contempt action.").

Moreover, the plaintiffs are plainly engaged in a bootstrapping procedural maneuver. They have no complaint about the independent monitor or the class notice, though they appealed those decisions; rather, they want us to review the denial of their original class-certification motion. This is an improper attempt to revive their untimely cross-appeal from the June 9 remedial order. We dismiss the plaintiffs' appeal.

Finally, MPS seeks review of the district court's orders certifying the class, finding liability, and approving DPI's settlement. Ordinarily these interlocutory orders would be unappealable, but MPS argues that the doctrine of pendent appellate jurisdiction applies. In *Swint v. Chambers County Commission*, 514 U.S. 35, 51 (1995), the Supreme Court " 'set out a general rule against exercising pendent jurisdiction over related rulings.' " *McKinney v. Duplain*, 463 F.3d 679, 692 (7th Cir. 2006) (quoting *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092 (9th Cir. 1998)). Pendent appellate jurisdiction "may be invoked 'only if there are compelling reasons for not deferring the appeal of the former order to the end of the lawsuit.' " *Montano v. City of Chicago*, 375 F.3d 593, 599 (7th Cir. 2004) (quoting *U.S. for Use of Valders Stone & Marble, Inc. v. C-Way Constr. Co.*, 909 F.2d 259, 262 (7th

Cir. 1990)). We may "review an otherwise unappealable interlocutory order if it is 'inextricably intertwined with an appealable one.'" *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010) (quoting *Montano*, 375 F.3d at 599). In other words, "'it must be practically indispensable that we address the merits of the unappealable order in order to resolve the properly-taken appeal.'" *Montano*, 375 F.3d at 600 (quoting *Valders Stone & Marble*, 909 F.2d at 262). If an otherwise unappealable order is sufficiently intertwined to permit pendent appellate jurisdiction, we may exercise our discretion to review it. *Jones v. InfoCure Corp.*, 310 F.3d 529, 536-37 (7th Cir. 2002).

The decision to exercise pendent appellate jurisdiction is inherently case specific. *See Montano*, 375 F.3d at 600. Here, our review of the appealable order—the June 9 order imposing the remedial scheme—simply cannot be conducted in isolation from the earlier orders. The June 9 order imposes a remedy for MPS's liability to the plaintiff class; deferring review of the class-certification and liability decisions until after final judgment would make our present review of the remedial scheme meaningless. As this case comes to us, it is "practically indispensable" that we review the class-certification and liability orders now "in order to resolve the properly-taken appeal." *Id.*; *see also Asset Allocation & Mgmt. Co. v. W. Emp'rs Ins. Co.*, 892 F.2d 566, 569 (7th Cir. 1989) ("[A]ny ruling on which the validity of the [appealable order] turns is reviewable . . . .").

The court's order approving DPI's settlement presents a closer question, but viewing the case as a whole, we

think this order is so closely linked with the others that it cannot be separated. Because we vacate the class certification, declining to exercise pendent jurisdiction over the order approving DPI's settlement would create the strangely anomalous result of a free-standing district court order approving and incorporating a settlement between a defendant and a class that no longer exists. Furthermore, with essentially the entire case already before us, deferring appellate review of the settlement would create rather than prevent piecemeal appeals; this too favors pendent appellate review. *See Greenwell v. Aztar Ind. Gaming Corp.*, 268 F.3d 486, 491 (7th Cir. 2001).

## B.  Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b). *See* FED. R. CIV. P. 23. In addition, a class must be sufficiently definite that its members are ascertainable. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("It is axiomatic that for a class action to be certified a 'class' must exist.").

Class certification is appropriate only if, "after a rigorous analysis," the trial court is satisfied that the requirements of Rule 23 have been met. *Wal-Mart*, 131 S. Ct. at 2551 (quotation marks omitted). "Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.*; *see also Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 890 n.6 (7th Cir. 2011) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). We review the district court's class-certification order for abuse of discretion, but legal determinations made in support of the decision are reviewed de novo. *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 573 (7th Cir. 2008).

There are several basic flaws in the district court's class-certification decision. First, the class is both fatally indefinite and lacks the commonality required by Rule 23(a)(2). Furthermore, although the case was certified as a class action for injunctive and declaratory relief under Rule 23(b)(2), final injunctive or corresponding declaratory relief cannot be ordered on a class-wide basis, as required for a Rule 23(b)(2) class.

We begin with the terms of the class definition, something over which the parties and the judge struggled mightily. The plaintiffs initially sought to represent a class so broad that it effectively included all students eligible for special education and related services from MPS. The original proposed class thus joined together all Milwaukee-area disabled students, regardless of differences in their disabilities or educational situations, whose procedural or substantive rights under the IDEA

were violated in any way. The district court properly rejected this sweeping class definition, but not for the obvious reason that it sought to lump together thousands of disparate plaintiffs with widely varying individual claims. Rather, the court rejected the plaintiffs' proposed class definition based on difficulties associated with the IDEA's requirement that administrative remedies be exhausted before filing suit.

The district court was justifiably concerned about the administrative-exhaustion requirement. But the court's effort to resolve the problem was misguided. The court sua sponte divided the class into two categories: those with "pre-determination claims" and those with "post-determination claims." These designations were apparently meant to categorize individual violations of the IDEA, separating those that occurred prior to an IEP meeting from those that occurred after an IEP meeting. The judge thought this categorization made it possible to excuse the exhaustion requirement for "pre-deter-mination claims" and allow these alleged IDEA violations to be litigated on a class-wide basis, while enforcing the exhaustion requirement for "post-determina-tion claims," excluding them from class-action treatment.

There is reason to doubt the propriety of this approach, but for present purposes we will address it on its own terms. Ordinarily, a plaintiff may not file an IDEA lawsuit without first exhausting available administrative remedies. *See* 20 U.S.C. § 1415; *Honig v. Doe*, 484 U.S. 305, 326-27 (1988); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir. 1996). However, exhaustion may

be excused if administrative review would be futile or inadequate. *Honig*, 484 U.S. at 326-27. The district court applied this exception to all pre-determination claims, reasoning that the parents of disabled students might not be fully aware of the right to administrative remedies prior to a properly constructed IEP meeting, making exhaustion an exercise in futility.[2] Once an IEP meeting is convened, however, the court thought that

---

[2] We question this reasoning. Wisconsin law requires that parents be notified of their administrative-review rights when a child is initially referred for evaluation, well before an IEP meeting occurs. WIS. STAT. § 115.792(1)(b). For this reason the defendants argued below that if exhaustion was to be excused on a class-wide basis for violations occurring before parents received notice of their right to administrative remedies, it should be excused for *pre-referral* claims only. The district court rejected this argument, perceiving "too great" a "potential of having parties unwittingly forgo their rights." Even when notice of administrative remedies was provided, the judge was "not sanguine with the fact that this information is always properly delivered or that the parents have a full understanding of the information." Let's assume for the sake of argument that it was appropriate to waive the exhaustion requirement on a class-wide basis on the rationale that parents "lacked full understanding" of their rights. The plaintiffs, as the proponents of the futility exception to the exhaustion requirement, would bear the burden of establishing this lack of understanding. *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 488 n.8 (2d Cir. 2002). That burden is not satisfied by the district court's unsupported intuition that notice might not always be "properly delivered" or that parents might not always understand it.

parents would sufficiently understand their rights, making administrative review adequate and keeping the IDEA's exhaustion requirement intact for post-determination claims. On this rationale the court was willing to certify a class defined to include only pre-determination claims, for which it excused the plaintiffs' failure to exhaust administrative remedies.[3]

---

[3] In settling on the pre-determination/post-determination line of demarcation, the district court relied heavily on the concept of "systemic" IDEA violations developed by other circuits, most prominently the Ninth Circuit in *Doe ex rel. Brockhuis v. Arizona Department of Education*, 111 F.3d 678, 681 (9th Cir. 1997). *Doe* discussed the distinction between "systemic" and "nonsystemic" IDEA claims in the context of deciding whether to apply the futility exception to excuse the plaintiffs' failure to exhaust administrative remedies prior to bringing a class-action suit. Here, however, the district court applied the Ninth Circuit's definition of a "systemic" IDEA violation in determining MPS's *liability*, using it as the substantive legal standard for evaluating whether MPS was in noncompliance with the IDEA system-wide. We question whether *Doe*'s definition of "systemic" IDEA noncompliance has any value outside its specific context—that is, outside the context of deciding as a threshold matter in a proposed IDEA class action whether to excuse the failure to exhaust administrative remedies. And even in that context, the line drawn in *Doe* between systemic and nonsystemic violations for purposes of the exhaustion requirement seems rather arbitrary. While some IDEA violations may implicate the structure of a school district's special-education program and may not be remediable through ordinary administrative review, it does not necessarily follow that administrative review is futile or

(continued...)

The court thus certified a class of its own creation:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

In other words, the certified class combined all disabled students eligible for special education from MPS who were not identified as potentially eligible for services, not timely referred for evaluation after identification, not timely evaluated after referral, not evaluated in a properly constituted IEP meeting, or whose parents did not (for whatever reason) attend an otherwise proper IEP meeting. The court made it clear that students who suffered a pre-determination violation but have since received a proper IEP meeting—for example, students who received a late IEP meeting—are also included in the class.

One immediately obvious defect in this class is its indefiniteness. A significant segment of the class (of unknown and unknowable size) comprises disabled students who may have been eligible for special education

---

[3] (...continued)

inadequate for *all* violations that are alleged to be "systemic." However, because our decision rests on other flaws in the class-certification decision and does not reach the substance of the court's liability decision, we neither accept nor reject the Ninth Circuit's reasoning in *Doe*.

but were *not identified* and *remain unidentified*. There is no question that MPS has a legal obligation under the IDEA to seek out disabled students and refer for evaluation those it reasonably believes are disabled and in need of special education. *See* 20 U.S.C. § 1412(a)(3)(A); WIS. STAT. § 115.77(1m)(a). The failure to properly identify a disabled student can itself be a violation of the IDEA *if* the failure results in the denial of a free appropriate public education to a qualifying child with a disability. *Cf. Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2495 (2009) ("A reading of the Act that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services."). The problem with a class of potentially eligible but unidentified students is not that their rights might not been violated but that the relevant criteria for class membership are unknown. By what standard is class membership to be determined? How is the court to decide whether there was reason to believe *in 2000-2005* that a presently unidentified child was *potentially eligible* for special-education services from MPS? It's not hard to see how this class lacks the definiteness required for class certification; there is no way to know or readily ascertain who is a member of the class.[4] *See Oshana*, 472 F.3d at 513; *Simer*, 661 F.2d at 669.

---

[4] Typical suits for child-find-violations focus on a school district's failure to *timely* identify a qualifying disability in an identified student, *e.g., Richard S. v. Wissahickon Sch. Dist.*, 334

(continued...)

Of course, unidentified but potentially eligible disabled students are defined not only by having not been identified but also by having a disability. If we could easily identify all Milwaukee students with disabilities during the relevant time period, perhaps we could cross-check that list against a list of known disabled students to determine which students MPS failed to identify and refer for an IEP evaluation. But identifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria. Every step of the child-find inquiry and IEP process under the IDEA is child specific and requires the application of trained and particularized professional educational judgment. In short, a class of unidentified but potentially IDEA-eligible disabled students is inherently too indefinite to be certified.

This conclusion draws support from *Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980). The plaintiffs in *Adashunas* alleged widespread violations of the child-find requirements in the IDEA's predecessor statute and proposed a class consisting of "all children within

---

[4] (...continued)
F. App'x 508, 510 (3d Cir. 2009), or a school district's failure to identify a disability despite a parental referral, *e.g.*, *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2488 (2009). In both situations the identity of the student is known. The class here includes *all* students not properly identified as potentially eligible for special education, the vast majority of whom are not individually known.

the State of Indiana entitled to a public education who have learning disabilities who are not properly identified and/or who are not receiving such special instruction as to guarantee them of minimally adequate education." *Id.* at 601. We noted the practical difficulty in defining the class in this way: "How does one identify class members consisting of persons not identified?" *Id.* at 603. In theory such a class might make sense if the process of identifying unknown class members was relatively simple. But because the task of identifying learning-disabled children is a "long, arduous process," and the proposed class of plaintiffs was "so highly diverse and so difficult to identify," we held that the class was "not adequately defined or nearly ascertainable" and the class action could not be maintained. *Id.* at 603-04 (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). The same is true here.

The plaintiffs insist that because the class is defined by reference to MPS's illegal actions—that is, by MPS's failure to comply with the IDEA—the defect of indefiniteness may be forgiven. For this principle they rely on *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977-78 (7th Cir. 1977), in which we upheld the certification of two plaintiff classes consisting of organizations and persons in Chicago who had been unconstitutionally monitored and harassed by various municipal and federal defendants in retaliation for exercising their First Amendment rights. The defendants in *Rochford* argued that this class—potentially large in scope and with no ready means of identifying its members—was

too indefinite to be certified. We concluded that "a class that satisfies all of the other requirements of Rule 23 will not be rejected as indefinite when its contours are defined by the defendants' own conduct." *Id*. at 978.

*Rochford*'s tolerance of a wildly indefinite class definition under Rule 23 is no longer the norm. We have noted that "[*Rochford*] is a relic of a time when the federal judiciary thought that structural injunctions taking control of executive functions were sensible. That time is past." *Rahman v. Chertoff,* 530 F.3d 622, 626 (7th Cir. 2008). Moreover, the class certified in *Rochford* is different from the one here in at least two critical respects. First, for reasons we will explain in a moment, class certification in this case does not comply with other requirements of Rule 23; more specifically, the class does not satisfy Rule 23(a)(2)'s commonality requirement, and it does not satisfy Rule 23(b)(2). Second, the defendants' actions in *Rochford* provided at least *some* means of identifying class members: Each class member was the victim of some discrete act of harassment that once revealed—for example, through discovery—would in turn reveal the identity of the victimized class member. Not so with the present class. MPS's alleged failure to identify disabled students in no way pins down the identities of the class members; the relevant conduct here is not a discrete action as in *Rochford* but rather a failure to act. The liability and remedial orders are powerful evidence of this difference; the elaborate scheme for identifying class members via a hybrid IEP process

dramatically illustrates the fatal indefiniteness of this class. *Rochford* is no help to the plaintiffs here.[5]

Beyond its inherent indefiniteness, the class certified here fails to satisfy Rule 23(a)(2)'s commonality prerequisite, which requires that the class claims involve "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). It's true that " '[e]ven a single [common] question' will do." *Wal-Mart*, 131 S. Ct. at 2556 (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 176, n.110 (2003)) (alteration in original). But the Supreme Court explained in *Wal-Mart* that superficial common questions—like whether each class member is an MPS student or whether each class member "suffered a violation of the same provision of law"—are not enough. *Id.* at 2551. Rather, "[c]ommonality requires the plaintiffs to demonstrate that the class members 'have suffered the same injury.' " *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

---

[5] Our conclusion that a class of child-find claims does not fit within *Rochford*'s carve-out is reinforced by the fact that we decided *Adashunas* less than three years after *Rochford* but did not even cite it.

The plaintiffs identify the following common issue: "[A]ll potential class members have suffered as a result of MPS' failure to ensure their Child Find rights under IDEA and Wisconsin law." This completely misunderstands Rule 23(a)(2). Whether MPS failed in its obligations under the IDEA and thereby deprived an eligible disabled child of a free appropriate public education is the bottom-line liability question in any individual plaintiff's IDEA claim. To bring individual IDEA claims together to litigate as a class, the plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims. That all the class members have "suffered" as a result of disparate individual IDEA child-find violations is not enough; it does not establish that the individual claims have any question of law or fact in common. The plaintiffs have identified no common factual or legal question that satisfies the Rule 23(a)(2) standard, and it is their burden to do so. *See Oshana*, 472 F.3d at 513.

To illustrate the commonality problem in the certified class, consider two hypothetical students within the class: one has a disability and would be eligible for special education but has never been identified as being disabled nor gone through the IEP process; another was identified as disabled and received a timely IEP meeting, but the child's parents did not attend the IEP meeting and were not notified of their right to do so. Both scenarios involve violations of the IDEA, but what common question can be answered that would assist the court in determining MPS's liability for each? On the

plaintiffs' theory, that question is something like this: Did MPS fulfill its IDEA obligations to each child? But while that generic question is surely a part of both children's claims, it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.

This was the basic commonality problem in *Wal-Mart*, which involved a nationwide class-action suit on behalf of female employees of the discount retailer for alleged sex discrimination in violation of Title VII. The Supreme Court summarized the lack of commonality in this way:

> In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a *pattern or practice* of discrimination. That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision . . . . Here respondents wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*

*Wal-Mart*, 131 S. Ct. at 2552 (internal quotation marks and citations omitted). Here, too, resolving any individual class member's claim for relief under the IDEA requires an inherently particularized inquiry into the circumstances of the child's case.

That the court narrowed its focus to child-find violations (what the court called "pre-determination claims") is not enough. Child-find inquiries, like other aspects of the IDEA, are necessarily child specific. There is no such thing as a "systemic" failure to find and refer individual disabled children for IEP evaluation—except perhaps if there was "significant proof" that MPS operated under child-find *policies* that violated the IDEA. *See id.* at 2553. As the Supreme Court noted in *Wal-Mart*, an illegal *policy* might provide the "glue" necessary to litigate otherwise highly individualized claims as a class. *Id.* at 2552-54. But again, as in *Wal-Mart*, proof of an illegal policy "is entirely absent here." *Id.* at 2553; *see also J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) (affirming the denial of class certification because the "plaintiffs merely attempt to broadly conflate a variety of claims [under the IDEA and other statutes] to establish commonality via an allegation of 'systematic failures'"). Lacking any common questions, the class fails to satisfy Rule 23(a)(2) and should not have been certified.

Finally, it should be clear from our discussion thus far that the district court also erred when it certified an injunction class under Rule 23(b)(2). Rule 23(b)(2) permits the court to certify a case for class-action treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). The final clause is important: The

injunctive or declaratory relief sought must be "final" to "the class as a whole." *See Kartman*, 634 F.3d at 892-94. In other words, "claims for *individualized* relief . . . do not satisfy [Rule 23(b)(2)]." *Wal-Mart*, 131 S. Ct. at 2557. To the contrary, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id*.

That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final. *See id*. ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted . . . .' " (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009))); *see also id.* at 2558 ("[T]he relief sought [under Rule 23(b)(2)] must perforce affect the entire class at once . . . ."); *Kartman*, 634 F.3d at 892-94; *Andrews*, 545 F.3d at 577. If individualized relief is sought—even individual injunctive relief—the named plaintiffs must look elsewhere

in Rule 23(b) to obtain certification.[6] *See Wal-Mart*, 131 S. Ct. at 2558-59; *Kartman*, 634 F.3d at 895.

The relief sought here does not come close to satisfying Rule 23(b)(2)'s standard. That much is clear from the intricate remedial scheme ordered by the district court, which requires thousands of individual determinations of class membership, liability, and appropriate remedies. While the compensatory-education remedies will often or always be injunctive in nature, there can be no single injunction that provides final relief to the class as a whole. It is no answer to say that the June 9 remedial order affects the entire class; that order merely establishes a system for eventually providing individualized relief. It does not, on its own, provide "final" relief to any class member. *See Andrews*, 545 F.3d at 577. Moreover, the remedial order requires class notice as a necessary element of its operation: Only those class members who respond are to be evaluated within the hybrid IEP system; nonresponders are unaffected. That the putative class members must *opt in* after notice and then be evaluated for membership in the class—*before* making a claim for entitlement to compensatory education— belies the notion that the court can provide final injunctive relief to the class as a whole. This is not the stuff of a proper Rule 23(b)(2) class.

---

[6] Our discussion of commonality makes it clear that the present class does not satisfy Rule 23(b)(3). Without even a single common question of law or fact, common questions cannot predominate. *See* FED. R. CIV. P. 23(b)(3).

So the class-certification order must be vacated. It follows that without a class to whom MPS can be liable and provide a remedy, the liability and remedial orders must be vacated as well. What remains are the claims of the individual plaintiffs; the district court did not find a denial of a free appropriate public education in any individual case.[7] Furthermore, the court's reasons for excusing administrative exhaustion appear to have been tied to the class allegations, and it's not clear whether the court would have excused exhaustion for any of the individual claims. Finally, it's possible—perhaps likely—that some of the named plaintiffs' individual factual circumstances have changed such that their claims are now moot. We leave to the district court on remand the task of determining whether anything remains of this case and what, if anything, should happen next.

## C. DPI Settlement

Finally, we turn to DPI's settlement with the plaintiff class. A district court may approve a class settlement if it is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). We review an order approving a class settlement

---

[7] As stated in the remedial order: "[A]t no point did the court receive specific evidence from educational professionals who engaged in an individualized assessment of the named plaintiffs, determined the nature of any denial of [a free appropriate public education], and determined precisely what sorts of services were necessary . . . ."

for an abuse of discretion. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006). As with any order reviewed under this standard, if the district court's analysis turned on an error of law, the court necessarily abused its discretion. *Wis. Right to Life State PAC v. Barland,* 644 F.3d 139, 150 (7th Cir. 2011).

After the district court found MPS and DPI liable for IDEA violations, DPI commenced settlement negotiations with class counsel and eventually submitted a settlement agreement for court approval. DPI agreed to appoint an independent monitor to oversee MPS's IDEA compliance and develop a compliance plan for MPS—with input from class counsel and the independent monitor—establishing specific requirements that DPI would in turn impose on MPS. The plan's implementation would be tied to several benchmarks DPI promised to enforce against MPS. Among other things, DPI agreed that MPS would evaluate 95% of referred students within the statutory time frame; that MPS would make reasonable attempts to include a parent in 95% of IEP meetings; and that MPS would refer 95% of students with a specified number of suspensions and 95% of students retained in grade to an early intervention system for the possibility of disability evaluations. The settlement also gave the independent monitor significant oversight authority over MPS, including the ability to order MPS to make administrative changes to comply with the settlement agreement. In exchange for these and other promises, the settlement released DPI from all claims in this suit and also purported to

preclude all class members from bringing any representative suit against DPI for IDEA violations that occurred prior to the settlement date.

It should be apparent from the foregoing description that this settlement agreement is highly unusual. DPI's primary concessions require performance *from MPS*, which is not a party to the agreement and did not consent. Sensing the problem, the district court allowed MPS to file an objection to the settlement. MPS argued that the settlement agreement impermissibly affected its legal rights and conflicted with state statutes governing DPI's oversight authority. The district court framed the question this way: Does "DPI ha[ve] the authority to order MPS to take the actions called for in the proposed settlement agreement[?]" If DPI has the legal authority to command MPS to take the specified actions, then the state agency's agreement to impose mandates on MPS would pose no problem. But if DPI does not have that legal authority—stated differently, if MPS has a legal right to resist such a demand from DPI—then a settlement agreement binding DPI to impose mandates on MPS, a nonparty, infringes MPS's legal rights.

"The general rule . . . is that a non-settling party does not have standing to object to a settlement between other parties." *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992). There is an exception when the nonsettling party "can show plain legal prejudice resulting from the settlement." *See id.* at 246-47 (citing *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1233 (7th Cir. 1983), and other cases). That a settling defendant creates

a tactical disadvantage for another defendant is not sufficient to support standing to object; the prejudice to the nonsettling defendant must be legal, such as (for example) interference with contractual or contribution rights or the stripping away of a cross-claim. *Id*. at 247. Here, as the district court correctly acknowledged, MPS's substantive objection to the settlement and its basis for standing are one and the same: If the settlement agreement prejudiced MPS's legal rights, MPS may object, and its objection has merit.

The district court ultimately held that MPS did not have standing to object because DPI has authority to implement the agreement. As the state agency with authority to dispense federal special-education funding, DPI is responsible for ensuring local compliance with the IDEA's requirements. *See* 20 U.S.C. § 1412(a)(11). Section 115.90 of the Wisconsin Statutes outlines the three enforcement mechanisms available to DPI should a local school district fail to comply:

> (1) If, as the result of a monitoring procedure or a complaint investigation, the state superintendent finds that a local educational agency has violated this subchapter, the state superintendent *may require the local educational agency to submit a corrective plan* addressing the violation.

> (2) If the state superintendent, after reasonable notice and an opportunity for a hearing, finds that a local educational agency has failed to comply with any requirement in this subchapter, the state superintendent *shall reduce or eliminate special education aid to*

*the local educational agency* until he or she is satisfied that the local educational agency is complying with that requirement.

(3) If the state superintendent finds that a corrective plan under sub. (1) has not been implemented, or that withholding aid under sub. (2) has been inadequate to ensure compliance with this subchapter, the state superintendent *shall request the attorney general to proceed against the local educational agency* for injunctive or other appropriate relief.

(Emphasis added.)

The district court focused on DPI's statutory authority under subsection (2) to withhold MPS's funding for failure to comply with the IDEA's requirements. Because MPS retained the right to appeal any suspension of funds to the Department of Education, *see* 34 C.F.R. § 76.401, the district court concluded that the settlement did not violate MPS's rights but rather "could be viewed as essentially another corrective action, similar to any one of the numerous other corrective action plans previously established by DPI."

This analysis overlooks key parts of Wisconsin's enforcement scheme. It's true that DPI has the authority to reduce MPS's federal funding or eliminate it altogether. But the settlement agreement does not implicate DPI's authority over the disbursement of federal funds; rather, DPI bound itself to impose a corrective plan on MPS. DPI does not, however, have the unilateral authority to impose a corrective plan on a noncompliant local school district. To the contrary,

DPI may only require that a local school district develop and submit a plan to address areas of IDEA noncompliance; the details of the plan are left to the local school district. *See* WIS. STAT. § 115.90(1). DPI can force a local school district to take specific remedial action *only* if the district fails to implement its own corrective plan. Alternatively, DPI can withhold or reduce federal funds, and if this more dramatic action does not induce compliance, the state superintendent of public instruction can ask the state attorney general to sue to bring the school district into compliance. *See id.* § 115.90(3).

The local school district's autonomous authority to develop its own corrective plan is no small distinction in the context of this case. Because DPI cannot unilaterally force MPS to take specific remedial action, a settlement that attempts to do exactly that prejudices MPS's legal rights by requiring more of MPS than Wisconsin law permits DPI to impose. The district court's conclusion to the contrary was an error of law, and because the decision to approve DPI's settlement turned in large part on this legal error, that decision was an abuse of discretion.[8]

---

[8] The parties note a change in Wisconsin law during the pendency of these appeals. Under 2009 Wisconsin Act 215 (published May 13, 2010), the state superintendent of public instruction is empowered to order certain low-performing school districts to take certain remedial actions. However, Act 215 does not amend section 115.90, or any other provision in the Wisconsin Statutes, Chapter 115, Subchapter V, the

(continued...)

Apart from this misunderstanding about DPI's statutory oversight authority, the district court's approval of DPI's settlement must be vacated for a much simpler reason: There can be no class settlement if the class should not have been certified in the first place. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999) ("[T]he determination whether 'proposed classes are sufficiently cohesive to warrant adjudication' must focus on 'questions that preexist any settlement.' " (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622-23 (1997))). Although class certification and settlement approval were sought separately here, the caselaw on so-called "settlement only" classes is instructive.[9] The Supreme Court has made clear that a settlement-only class must satisfy the bulk of Rule 23's requirements in order to be certified. *See id.* at 864; *Amchem*, 521 U.S. at 620. And when a district court abuses its discretion in certifying a settlement-only class, we unwind not only the class certification but also the class settlement. *See, e.g.*, *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881-82 (7th Cir. 2000) (vacating order approving class settlement because class did not satisfy Rule 23(b)). Basic principles of due process prevent individual named plaintiffs from binding—through litigation or court-approved settle-

---

[8] (...continued)

statutory scheme relevant to special education. Accordingly, Act 215 does not appear to affect the state regulatory apparatus pertaining to the IDEA.

[9] Settlement-only classes are those for which class certification and settlement approval are sought simultaneously.

ment—absent class members the plaintiffs do not legally represent.[10]

As we have explained, the class here is fatally indefinite, lacks the commonality required by Rule 23(a)(2), and was improperly certified under Rule 23(b)(2). Because the named plaintiffs do not legally represent the absent class members, they cannot settle the absent class members' claims. The district court's order approving DPI's settlement must be vacated.

---

[10] As summarized by the Court in *Ortiz v. Fibreboard Corp.*:

> [Class actions] implicate the due process "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," *Hansberry v. Lee*, [311 U.S. 32, 40 (1940)], it being "our 'deep-rooted historic tradition that everyone should have his own day in court,'" *Martin v. Wilkes*, [490 U.S. 755, 762 (1989)] (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)); see *Richards v. Jefferson County*, [517 U.S. 793, 798-99 (1996)]. Although "'[w]e have recognized an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party,'" . . . *Martin*, [490 U.S. at 762 n.2], the burden of justification rests on the exception.

527 U.S. 815, 846 (1999).

### III. Conclusion

For the foregoing reasons, we DISMISS the plaintiffs' appeal (number 09-3274) for lack of appellate jurisdiction. We DENY the motion to dismiss MPS's appeal (number 09-2741). We VACATE the district court's class-certification order, its liability order following Phase II of the trial, its order approving DPI's settlement, and its remedial order following Phase III of the trial. We REMAND the case for further proceedings consistent with this opinion.

ROVNER, *Circuit Judge*, concurring in part and dissenting in part.  I share many of my colleagues' concerns about the way in which the class was defined in this case, and I further agree that because DPI lacked the authority to unilaterally impose a corrective plan on a local school district, it was error to approve DPI's settlement with the plaintiffs. However, I am not convinced that no class was feasible in this case, nor do I believe that the inability to identify class members until the remedial phase of the litigation precludes certification of the class. For these reasons, I write separately.

On its face, the class certified in this case bears the hallmarks of the sort of open-ended classes of which we

disapproved in *Adashunas v. Negley*, 626 F.2d 600, 603-04 (7th Cir. 1980), and *Rahman v. Chertoff*, 530 F.3d 622, 625-26 (7th Cir. 2008). Although the class that the district court approved (all school age children with disabilities who reside within the MPS district, who are or may be eligible for special education services, and who are, have been, or will be denied or delayed entry into or participation in the IEP process) is considerably more narrow than the class originally proposed by the plaintiffs (all school age children with disabilities who reside within the MPS district and who are or may be eligible for special education services), it was never formally delimited by the particular types of violations that the plaintiffs were alleging. The consequence of such an open-ended description of the class, as we noted in *Rahman*, is that "every time plaintiffs file a brief or motion, membership in the class[ ] may change." *Id*. at 625. Thus, at any given point during the litigation, it may not be possible to know from the class definition itself what the true parameters of the class are and what types of individuals might be in the class. *Id.* at 625-26. In this case, the class has been defined to include all students eligible for special services who have been denied or delayed entry into the IEP system. That definition literally may include students who were delayed or denied entry due to circumstances having little or nothing to do with the defendants' actions, by essentially random circumstances that are unique to one student or limited to a small number of students, or by circumstances that the class representatives have not identified as a basis for relief to the class.

I am mindful that the parties and the court, from the time that the class was certified forward, appear to have developed an understanding that the class would include the four sets of individuals that the court later expressly identified in its liability decision: (1) students with suspected disabilities who were never referred for an evaluation; (2) students who were referred for evaluation, but whose evaluations were not completed within the requisite 90-day limit; (3) students who were suspended in such a way as to frustrate their evaluation; and (4) students whose IEP meetings took place in the absence of their parents. *See ante* at 9; R. 195 at 3-6; R. 389 at 61. Moreover, the court's liability decision was limited to the time period commencing in September 2000 and ending in June 2005. R. 389 at 3. In these respects, the litigation ultimately focused on a class of students that was much more limited than the certified class was on its face, and one that in the end was much more definite than the sweeping class we criticized in *Adashunas*, for example.

But even as confined to these four groups of students and this roughly five-year period, the class includes unknown numbers of variations. To cite one example: When, in her 2004 report, Dr. Rogers-Adkinson addressed MPS's failure to meet statutory deadlines during the assessment process, she identified at least four different patterns of delays: (1) delays occasioned by the initial mis-categorization of a student's suspected disability; (2) delays caused by extensions of time routinely requested for disability assessments solicited during the spring semester; (3) delays triggered by the need for

additional medical records; and (4) delays for reasons not revealed in the files she reviewed. Plaintiffs' Ex. 8 at 6, 8-9. Each of these four scenarios might be a manifestation of MPS's failure to timely identify students with disabilities and to convene IEP meetings to address those disabilities, but it is difficult to discern a common, wrongful policy or practice that might account for them all. Instead, this looks more like an effort to sweep many individual plaintiffs and sets of facts into one class on the premise that all reflect illegal conduct by the defendant in practice and culture if not in policy. As the majority points out, *ante* at 32, that is precisely the sort of class that the Supreme Court recently rejected in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). Like my colleagues, I am not convinced that the certified class in this case is united by common legal or factual issues.

Nonetheless, I do not rule out the possibility that a class properly could be certified in this case or one like it, and it is to this limited extent that I dissent. My colleagues have concerns both with the notion that a class action may be premised on "systemic" violations of a school district's child-find obligations and with a class composed of individuals whose identity cannot be known until the remedial phase of the litigation. However, I believe that notwithstanding the inherently child specific nature of child-find inquiries, a class action based on a truly systemic child-find failure may be viable. And the fact that it may not be possible to identify individual class members until the remedial phase of the litigation, when prospective members of the class are invited to come forward and establish that

they were among those injured by this systemic failure, should not preclude a class action, which may be the only realistic avenue of relief for those injured by systemic violations of their rights.

Systemic violations of the IDEA are cognizable. *See Doe ex rel. Brockhuis v. Ariz. Dep't of Educ.*, 111 F.3d 678, 681 (9th Cir. 1997) (coll. cases). The problem here is that the plaintiffs' claims appear to be based on multiple, disparate failures to comply with the school district's statutory child-find obligations rather than a truly systemic policy or practice which affects them all. But my colleagues go so far as to state that "[t]here is no such thing as a 'systemic' failure to find and refer individual disabled children for IEP evaluation—except perhaps if there was 'significant proof' that MPS operated under child-find *policies* that violated the IDEA." *Ante* at 33 (emphasis in original) (citing *Wal-Mart*, 130 S. Ct. at 2553). Certainly I agree that an illegal policy would support a claim for a systemic violation of the IDEA's child-find mandate. But I also think that wide-spread practices might also support such a claim. *Cf. King ex rel. King v. E. St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) (citing *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)) (noting that municipal liability under 42 U.S.C. § 1983 may be based on customs and practices as well as formal, written policies). Suppose, for example, that MPS ignored and did not refer for evaluation students with a particular type of potential disability—e.g., dyslexia—and as a result, large numbers of students with that disability went unidentified and were deprived of the educational services to which they

were entitled under the IDEA. To my mind, this would be a genuinely systemic violation of the district's child-find obligations that would be amenable to recognition and remediation in a class action: Notwithstanding the fact that each student is unique and is entitled to his own, individualized IEP, all members of the class would suffer a common injury resulting from the school district's failure to have appropriate systems in place to identify students with that particular disability. Insisting instead that each student exhaust his administrative remedies and/or sue independently would surely mean that many such students would reamin unidentified and denied their right to free appropriate public education (if only because they would be unaware of their rights) and likely would mean that the systemic violation underlying their claims to relief would persist, as any individual proceedings would result in individual rather than structural relief.

A key reason why my colleagues are reluctant to acknowledge the possibility of a systemic violation of a school district's child-find obligations is the inability to identify individual class members except by asking the parents of putative class members to come forward at the remedial phase of the litigation and to establish, in individual hearings, that their children were in fact the victims of the district's child-find failures. But this method of identifying class members is hardly unprecedented. Our decision in *McDonald v. United Air Lines, Inc.*, 745 F.2d 1081 (7th Cir. 1984), reflects a similar approach. The class in *McDonald* comprised women who had lost their jobs as a result of United Air Line's rule (dating back to the 1930s) prohibiting marriage for its female

cabin attendants. Once this court declared the no-marriage rule to be a violation of Title VII's ban on sex discrimination in *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir. 1971), any woman who had lost her position as a result of that rule between the date Title VII took effect in 1965 and United's abolition of the rule in 1968 became entitled to relief. *See McDonald v. United Air Lines, Inc.*, 587 F.2d 357 (7th Cir. 1978). But many if not most of the class members had simply resigned their positions in contemplation of the no-marriage rule rather than formally protesting the rule or waiting for the company to discharge them, so there was no record enabling easy identification of those women who left because of the no-marriage rule as opposed to another reason. Consequently, the onus was on former flight attendants to come forward at the final stage of the litigation and claim entitlement to relief, at which point individual, adversarial hearings were convened before special masters in order to establish whether each claimant in fact left her position because of the illegal rule. *See McDonald*, 745 F.2d at 1087-88.

As in *McDonald*, there will be times when the nature of the challenged conduct makes it difficult if not impossible to identity who is in the class and is entitled to relief absent some sort of opt-in procedure by putative class members coupled with an adjudicatory procedure to confirm that they in fact qualify as class members. In *McDonald* this was true because so many class members silently resigned their jobs in deference to their employer's illegal rule; in a child-find case like this one it would be true because the school district neglected

its obligation under the IDEA to identify students with potential disabilities. This is not a function of a poor or open-ended class definition as in *Rahman*, but rather due to the fact that the defendant's conduct did not produce a tidy record of the individuals harmed by that conduct. Identifying class members in such circumstances necessarily will require a relatively cumbersome, after-the-fact inquiry of the sort employed in *McDonald* and as the district court envisioned here. The only alternative is to foreclose class-wide relief in such cases and leave each individual harmed by the defendant's conduct to pursue relief on his or her own, if he or she is even aware that a wrong has been committed. Realistically, that will mean no relief at all for most individuals.

For all of these reasons, I concur in the court's conclusion that the class certified in this case was improper, but I do not join its conclusion that no class would be viable in this case or other litigation alleging violation of a school district's child-find obligations absent an ability to identify an express policy that violates the IDEA.