**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 25-1520**

───────────────

THOMAS E. OVERBY, JR., individually and on behalf of all others similarly situated; ABBY GEARHART, individually and on behalf of all others similarly situated,

        Plaintiffs – Appellees,

v.

ANHEUSER-BUSCH, LLC,

        Defendant – Appellant.

------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

        Amicus Supporting Appellant.

NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; METROPOLITAN WASHINGTON EMPLOYMENT LAWYERS ASSOCIATION; NORTH CAROLINA ADVOCATES FOR JUSTICE; NORTH CAROLINA JUSTICE CENTER; NATIONAL EMPLOYMENT LAW PROJECT; IMPACT FUND,

        Amici Supporting Appellee.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Arenda L. Wright Allen, Senior District Judge. (4:21−cv−00141−AWA−DEM)

───────────────

Argued: May 5, 2026                                    Decided: June 15, 2026

Before WILKINSON, RICHARDSON, and BERNER, Circuit Judges.

—————————————

Vacated and remanded in part and dismissed in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Richardson and Judge Berner joined.

—————————————

**ARGUED:**  James Edward Tysse, AKIN GUMP STRAUSS HAUER & FELD, LLP, Washington, D.C., for Appellant.  Robert Wesley Thayer Tucci, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellees.  **ON BRIEF:**  Robert G. Lian, Jr., Margaret O. Rusconi, Katherine I. Heise, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellant.  Craig J. Curwood, Zev H. Antell, Samantha R. Galina, BUTLER CURWOOD, PLC, Richmond, Virginia; Gregg C. Greenberg, Thomas J. Eiler, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellees.  Jennifer B. Dickey, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C.; Brian D. Boone, ALSTON & BIRD LLP, Charlotte, North Carolina, for Amicus Chamber of Commerce of the United States of America.  Michael J. Scimone, OUTTEN & GOLDEN LLP, New York, New York, for Amici National Employment Lawyers Association and Metropolitan Washington Employment Lawyers.  Carol L. Brooke, NORTH CAROLINA JUSTICE CENTER, Raleigh, North Carolina; Marcus Samuel McGee, WILDER PANTAZIS LAW GROUP, Charlotte, North Carolina, for Amici North Carolina Advocates for Justice, North Carolina Justice Center, National Employment Law Project and Impact Fund.

—————————————

2

WILKINSON, Circuit Judge:

Defendant, a prominent brewing company, challenges the certification of a class action concerning its alleged failure to compensate employees for a host of pre- and post-shift work activities. At its core, this case is about the requisite specificity district courts must employ in Rule 23 predominance and commonality analyses. In *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671 (4th Cir. 2024), we held that relying solely on overly generalized company policies will typically defeat class-action certification because these formulations too often disguise the dissimilarity of prospective class members.

The present case epitomizes this exact trap. In defining the common question at too high a level, the district court failed to observe the myriad variations in employees' circumstances. Indeed, because we find substantial variance in the tasks employees performed, when/where those tasks occurred, and the legal standards to which prospective class members are subject, we vacate the class-certification order and remand for further proceedings.

I.

A.

Defendant-appellant Anheuser-Busch, LLC produces many a popular brew, including beers sold under the Budweiser, Bud Light, and Michelob labels. The company operates numerous breweries throughout the country, including one in Williamsburg, Virginia, where it employs approximately 400 hourly workers at any given time. All the claims in this present case pertain to this Williamsburg location ("Brewery").

3

Hourly employees work in five departments: brewing, operations, quality assurance, utilities, and maintenance. Brewery premises include industrial workspace relevant to these roles as well as spaces for employee leisure and storage, such as a gym, a café, and locker rooms. To access any of these areas, hourly employees swipe a badge and enter through a turnstile. This swipe data is stored in Anheuser-Busch's electronic timekeeping system.

The company does not compensate employees according to this swipe data. Rather, it generally pays employees only for scheduled shift hours. The Brewery operates continuously with three shifts: a day shift from 7:00am to 3:00pm, an afternoon shift from 3:00pm to 11:00pm, and a night shift from 11:00pm to 7:00am. Anheuser-Busch expects employees to be at their workstations immediately at the start of their shift and to continue working there until the shift concludes. If employees need to work outside of shift hours, they must proactively notify their manager, who will ensure that they receive pay for any preapproved extra time. J.A. 314, 511–12. Indeed, Anheuser-Busch commits itself to pay employees for all hours actually worked. Employees, however, are not consistently paid for their pre- and post-shift work.

When in industrial spaces in the Brewery, employees must wear various personal protective equipment ("PPE"). As a baseline, employees in all five departments must don steel-toed boots, safety glasses, earplugs, and a "bump cap" (a baseball cap with a hard plastic insert). Certain roles within the Brewery require additional PPE, including wetsuits, high-visibility vests, and Kevlar gloves. J.A. 789, 977, 1006, 1199, 1207. Some employees don/doff pieces of PPE at home, *see, e.g.*, J.A. 715–16, 979, 1106, others don/doff pieces

4

of PPE during shift hours, *see, e.g.*, J.A. 725–26, 800, 1328, and yet others don/doff it all in the locker room outside of shift hours, *see, e.g.*, J.A. 196, 790, 1207, 1221, 1388.

During the COVID-19 pandemic, Anheuser-Busch imposed even more rigorous health and safety requirements. One written directive entitled "Expectations Mandatory for All" required temperature checks, face coverings, handwashing, and shoe sanitization before entry into the Brewery. J.A. 848 (capitalization altered). These practices ceased in February 2022.

## B.

Named plaintiffs Thomas Overby and Abby Gearhart brought suit against Anheuser-Busch under the Virginia Wage Payment Act ("VWPA"), the Virginia Overtime Wage Act ("VOWA"), and the Fair Labor Standards Act ("FLSA"). They alleged that the company had a "corporate policy of failing to compensate Plaintiffs for all mandatory pre- and/or post-shift work." J.A. 114–15. Plaintiffs sought unpaid wages and other damages arising from these specific tasks, but did not seek compensation for *all* off-shift time spent on Brewery premises (*e.g.*, exercising in the gym or chatting with colleagues over coffee).

Plaintiffs' claims involve three analytical steps. First, plaintiffs allege that the company has various requirements that must be met before employees arrive at their workstation and after they leave the workstation. These include, but are not limited to, donning/doffing PPE, complying with the COVID-19 health protocols, partaking in shift-handoff meetings, and securing and putting away tools. Second, because Anheuser-Busch requires employees to be present and working at their designated station the moment their

5

shift starts until the moment their shift concludes, preparatory and cleanup steps necessarily fall outside shift hours. And third, because Anheuser-Busch does not automatically compensate employees beyond the eight-hour shift, plaintiffs have not received pay for compensable pre- and post-shift work.

Except for threshold PPE and COVID-19 protocols, hourly workers do not all claim to perform the same categories of pre- and post-shift work. Some denied conducting consistent handoff meetings, for instance. *See, e.g.*, J.A. 519, 719, 792, 1101, 1174, 1410. Moreover, while practically all deposed employees worked during the pandemic, plaintiffs' complaint and motion for class certification swept in employees hired after the Brewery's cessation of COVID-19-related practices. J.A. 49, 116.

Anheuser-Busch consented to the conditional certification of an FLSA collective action, and 71 Brewery employees opted in. Later, in April 2024, the named plaintiffs moved for class certification of their VWPA and VOWA claims under Federal Rule of Civil Procedure 23(b)(3). Anheuser-Busch opposed the motion and cross-moved for decertification of the FLSA collective action. While these motions were pending, our court released its decision in *Bojangles*. Both parties provided supplemental materials to the district court regarding this pertinent legal development.

## C.

The district court found that plaintiffs met Rule 23(a) and (b)(3)'s requirements for numerosity, commonality, predominance, superiority, typicality, and adequacy, and thus certified the proposed class. It defined the class as follows:

6

All individuals who are currently, or were formerly, employed at Anheuser-Busch's Williamsburg brewery as non-exempt employees subject to Anheuser-Busch's LTM timekeeping system at any time from July 1, 2020, through the date of final disposition of the action.

J.A. 1767.

In finding commonality, the district court relied on the high-level questions of whether Anheuser-Busch "compensate[d] class members for time spent on mandatory pre- and post-shift tasks, including compliance with COVID-19 protocols," and whether the "failure to provide such compensation violates Virginia law." J.A. 1760. It further determined that these questions predominate, but provided limited reasoning to support this conclusion:

> [T]he overarching issue of Anheuser-Busch's alleged policy and practice with regard to paying hourly employees only for their scheduled shift times (absent special circumstances), despite requiring additional pre- and post-shift work, is the primary issue to be litigated. Such "common conduct" by Anheuser-Busch "bear[s] on the central issue in the litigation"—whether the proposed class members must receive compensation for required pre- and post-shift work.

J.A. 1760–61 (second alteration in original) (citations omitted). The district court declined to decertify the FLSA collective action for "essentially the same reasons." J.A. 1766.

Anheuser-Busch petitioned for permission to appeal the class-certification order under Rule 23(f).[1] We granted the petition.

---

[1] Anheuser-Busch asks us to review the district court's decision to deny decertification of the FLSA collective action either under Rule 23(f) or as an exercise of pendent appellate jurisdiction. While FLSA collective actions and Rule 23(b)(3) class actions do involve overlapping inquiries, we note that several of our sister circuits have declined to expand interlocutory review in this manner. *See, e.g.*, *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 764–65 (D.C. Cir. 2023); *Reinig v. RBS Citizens, N.A.*, 912 F.3d
(Continued)

7

II.

We review the district court's class-certification decision for abuse of discretion. *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 929 (4th Cir. 2025). Such an abuse occurs whenever the district court "materially misapplies the requirements of Rule 23," be it through clear factual errors or legal errors. *Bojangles*, 123 F.4th at 678 (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014)).

Here, the district court committed legal error in finding that plaintiffs' proposed class met Rule 23's commonality and predominance requirements despite significant variation in prospective class members' alleged pre- and post-shift work. Indeed, in so doing, the district court erroneously ignored the directives of our binding *Bojangles* precedent.

A.

A class action represents an exceptional form of litigation. It departs from the "usual rule that litigation is conducted by and on behalf of the individual named parties only." *United States v. Sanchez-Gomez*, 584 U.S. 381, 387 (2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). As such, we permit class certification only when plaintiffs have satisfied the requirements set forth under Rule 23. This is no perfunctory bar. "A party

---

115, 130–33 (3d Cir. 2018); *Myers v. Hertz Corp.*, 624 F.3d 537, 552–58 (2d Cir. 2010). We find their reasoning unobjectionable and therefore dismiss this portion of the appeal for want of jurisdiction.

seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

First, under Rule 23(a), plaintiffs must make four threshold showings: (1) that prospective class members are numerous, (2) that common questions of law or fact inhere in the action, (3) that proposed class representatives bring claims typical of the broader class, and (4) that such representatives will fairly and adequately represent the interests of the whole class. *Bojangles*, 123 F.4th at 678; *G.T. v. Bd. of Educ.*, 117 F.4th 193, 202 (4th Cir. 2024).

If the proposed class meets these criteria, it must still "fall within one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Rule 23(b)(1) covers situations in which separate actions would risk "establish[ing] incompatible standards," Fed. R. Civ. P. 23(b)(1)(A), or where circumstances, such as a defendant's "limited fund[s]," "impede [individual litigants'] ability to protect their interests," Fed. R. Civ. P. 23(b)(1)(B) & advisory committee's note to 1966 amendment. And Rule 23(b)(2) covers actions for injunctive or declaratory relief. Here, plaintiffs bring a damages action under Rule 23(b)(3), a provision "in which 'class-action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed R. Civ. P. 23 advisory committee's note to 1966 amendment). As a result, Rule 23(b)(3) requires that common questions "predominate over" individualized inquiries, and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This predominance test is intertwined with Rule 23(a)

9

commonality. "Predominance presupposes that a common question exists and measures the question's significance to the pending litigation." *Bojangles*, 123 F.4th at 679. In other words, commonality is a subfactor of predominance. *See Amchem*, 521 U.S. at 624 (indicating that "the predominance criterion is far more demanding" than commonality).

These barriers strike a careful balance between competing interests. On one hand, the class-action mechanism serves the important function of vindicating the interests of the aggrieved. That is certainly true in cases where low-dollar injuries may otherwise disincentivize litigation. *Bojangles*, 123 F.4th at 683. Indeed, a class action may represent the only realistic route to recovery in federal court for a variety of small, but still meaningful, worker and consumer claims. *See* 28 U.S.C. § 1332(a), (d)(2). And class actions collect such claims in a manner that promotes "efficiency and economy of litigation," *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974), and discourages a "drip of repeated individual actions" inundating defendants, *Bojangles*, 123 F.4th at 678.

On the other hand, however, the aggregation of thousands of claims can place intense pressure on defendants to settle or face crippling "blackmail settlements." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023) (quoting HENRY J. FRIENDLY, FEDERAL JURISDICTION: A GENERAL VIEW 120 (1973)). Rule 23's drafters foresaw this exact risk: "[a]n order granting certification . . . may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." Fed. R. Civ. P. 23 advisory committee's note to the 1998 amendment; *see also Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 333 (2025) (Kavanaugh, J., dissenting from the dismissal of certiorari).

As an "'adventuresome innovation' of the 1966 amendments [to the Federal Rules of Civil Procedure]," (b)(3) class actions represent a potential threat to Rule 23's fragile equipoise. *Wal-Mart*, 564 U.S. at 362 (quoting *Amchem*, 521 U.S. at 614). Indeed, as variation amongst class members increases, collective resolution of their claims becomes a more complicated and daunting affair. Interests in judicial economy accordingly fade, and the scale tips against invoking the class-action mechanism. We must therefore observe carefully the predominance and superiority criteria to ensure that "resources are not wasted pursuing litigation that is aggregate only in theory," and that defendants need not face the choice of whether to "settle or bet the store." *Bojangles*, 123 F.4th at 678, 683.

As we explained in *Bojangles*, a key safeguard embedded in our commonality and predominance analyses is eschewing overly general articulations of common questions, including alleged company policies. *Id.* at 680 ("Allegations of generalized policies are not usually sufficient for the purposes of class certification."). With this precept in mind, we turn to Anheuser-Busch's alleged policies of uncompensated pre- and post-shift work.

## B.

Rule 23(a) commonality requires the presence of at least one question susceptible to "classwide resolution" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In certifying the class, the district court relied on the broad question of whether Anheuser-Busch failed to compensate mandatory pre- and post-shift labor in violation of Virginia law. But, in *Bojangles*, we rejected commonality and predominance analyses

11

conducted at such high levels of generality precisely because "[s]uch vagueness may mask a multitude of disparities." 123 F.4th at 680.

One can always frame a question in such an abstract manner as to elicit a common response. But such semantic gerrymandering does not reflect the duties and obligations inherent in Rule 23. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 318 (6th Cir. 2025) (en banc) ("[Asking] generalized questions . . . . undermine[s] the bedrock principle that courts must identify common questions with respect to concrete elements of each claim."). Indeed, adopting abstract common questions can obscure more significant subquestions not susceptible to easy class-wide resolution. Operating at such a lofty level thereby renders a class more vulnerable to attacks on predominance as well.

The present case illustrates this danger. On its face, resolution of the alleged common question would appear to determine liability across the entire class. But to do so, one must circularly assume that all class members in fact performed off-shift work and that Anheuser-Busch required the work to be performed off-shift. Thus, it is impossible to resolve this alleged common question without first answering a number of threshold inquiries: Did the employee don and doff PPE on Brewery premises outside of shift hours? Did the employee perform mandatory handoff or carryover meetings outside of shift hours? Did the employee work during the period in which Anheuser-Busch mandated COVID-19 health policies?

These questions have no common answer; they involve more particularized engagement with the record and reveal significant variation amongst prospective class members. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[A] common

12

question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." (citation modified)). This variation comes in three different flavors: (1) whether class members performed specific categories of mandatory pre- or post-shift work *at all*, (2) where/when class members performed that off-shift work; and (3) what legal standards class members were subject to during the relevant employment periods. All three questions impede the common resolution of liability.

For example, if an employee never performed a task, Anheuser-Busch need not pay for it. The putative class will assuredly include individuals employed after the cessation of Anheuser-Busch's COVID-19 protocols in February 2022. Thus, a whole swath of class members will never have been subject to these protocols. Likewise, depending on employees' job roles, they may never have conducted shift-handoff or carryover meetings, performed them only for a brief period during their employment, or irregularly. *See, e.g.*, J.A. 519 (indicating that handoff meetings "var[y] from person to person and job to job"); J.A. 792 ("Well, right now, we don't get a carryover from the previous shift . . . ."); J.A. 719 ("[The handoff meetings] went away . . . . it's only brew tech IIs who are doing the meetings now . . . ."); J.A. 1101 (indicating that "verbal handovers" did not occur "every shift" and were not mandated by Anheuser-Busch); J.A. 1174 ("[L]et me be clear. Those meetings don't always happen."); J.A. 1410 (indicating that "whether and when [handoff meetings] took place kind of varied day to day"). This remains true of many other job-specific activities, including donning/doffing additional PPE. Some employees performed such tasks, *see, e.g.*, J.A. 789, 977, 1006, 1199, 1207, but many did not. If individuals do

13

not allege any other compensable pre- or post-shift labor, their claims might fail even while others' succeed. Thus resolution of the "common" question currently requires mini-trials into the exact nature of individual employees' off-shift work, and whether Anheuser-Busch mandated said labor.

Moreover, if employees performed tasks off Brewery premises, these activities might not constitute compensable, company-mandated activities. For instance, although Anheuser-Busch concedes that all employees present in industrial workspaces must wear baseline PPE, *see* Oral Arg. at 05:25–05:35; J.A. 846, not all employees don/doff the equipment on Brewery premises. While many do utilize the Brewery's locker rooms for this task, *see, e.g.*, J.A. 196, 790, 1199, 1207, 1221, 1388, a number of employees frequently put on steel-toed boots, bump caps, and/or other pieces of PPE in the comfort of their own home, *see, e.g.*, J.A. 395, 715–16, 979, 1106, 1328. It is not clear that putting on your work boots instead of your personal sneakers before leaving the house is a compensable work activity. *See* Dep't of Lab., Wage & Hour Div., Field Operations Handbook, ch. 31 § 31b13 (Aug. 10, 2016) ("Employees who dress to go to work in the morning are not working while dressing even though the uniforms they put on at home are required to be used in the plant during working hours."); *Bamonte v. City of Mesa*, 598 F.3d 1217, 1227–28 (9th Cir. 2010). Indeed, we generally conceive of ordinary commute times, for example, as non-compensable. *See* 29 U.S.C. § 254(a). At the other extreme, some PPE donning/doffing and handoff meetings occurred during shift hours, and thus the company has already rendered sufficient payment. *See, e.g.*, J.A. 725–26, 800, 991, 1328.

14

Thus one cannot determine compensability without looking at individual employee behavior.

And even ignoring these factual disparities, prospective class members also rely on different liability standards. Plaintiffs cite VOWA and VWPA for their principal causes of action in their complaint. But they readily acknowledge that the statutory scheme saw substantial revisions in July 2022. Indeed, VOWA changed from an independently structured state law to a parroting of the FLSA. *Contrast* Act of Mar. 30, 2021, ch. 445, 2021 Va. Acts 1st Spec. Sess. 1290, *with* Va. Code § 40.1-29.2, *and* 29 U.S.C. § 201 *et seq.* This new standard makes clear that certain non-integral preliminary activities are non-compensable. *See* 29 C.F.R. § 790.6(a). Because of the timing of this amendment, some putative class members are subject to one pre-2022 legal standard, some are subject to another post-2022 standard, and some who worked during both periods are subject to both standards. Thus, before applying facts to law, one must conduct individualized inquiries into the relevant statute(s) covering each class member. The district court did not reckon with this distinction.

### C.

Prospective class members might also diverge from one another at the damages stage. To be sure, individualized damages inquiries alone usually remain insufficient to defeat class certification. *Gunnells*, 348 F.3d at 429 (compiling cases). For example, while each employee might spend different amounts of time performing any given task, a court can resolve this issue by employing statistical averages or by bifurcating liability and

15

damages trials. *See Tyson Foods*, 577 U.S. at 454–55; *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 685–86 (1946); 4 WILLIAM B. RUBENSTEIN, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 11:6 (6th ed. 2025). Indeed, *Tyson Foods* permitted such common-damages models for the don/doffing of PPE in food production facilities—a task at issue here. 577 U.S. at 447, 454–55. But a court must first assure itself that such practices are sufficiently uniform across class members. Upon remand, the district court may assess the necessity and validity of any proposed algorithm for common damages calculations.

III.

The district's court's errors with regard to commonality and predominance are exacerbated by a class definition that sweeps too broad. Rule 23(c)(1)(B) imposes a responsibility to produce "a readily discernible, clear, and precise statement of the parameters defining the class." *Bojangles*, 123 F.4th at 680–81 (quoting *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006)). The specificity of these class parameters allows courts of appeal to ensure classes' compliance with Rule 23.

Here, however, the district court did not fit the class definition to plaintiffs' factual claims. Instead, the class definition effectively encompasses all hourly employees at the Brewery, with no caveat whatsoever. The district court thereby wrongly "presumes, without more, that all [hourly employees] who worked within the relevant timeframe have a viable claim against" Anheuser-Busch. *Id.* at 681. Just like an overly abstract common question, such "a circular class definition," can conceal underlying issues with

16

commonality and predominance. *In re White*, 64 F.4th 302, 314 (D.C. Cir. 2023). Indeed, overbreadth poses the unmistakable risk that "the district court may inadvertently be 'lump[ing] together' a great many 'disparate plaintiffs with widely varying individual claims.'" *Bojangles*, 123 F.4th at 681 (alteration in original) (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012)).

Upon remand, the district court can endeavor to resolve these issues or deny class certification altogether. In doing the former, it would be wise to employ subclasses reflecting some of the distinctions raised above. *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."); *Bojangles*, 123 F.4th at 681–82 ("Subclasses may be appropriate when proposed classes sweep widely because overly general class definitions heighten the concern that members have 'divergent interests.'" (quoting 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 4:45 (21st ed. 2024))). For example, a subclass might include only employees present for the COVID-19 protocols or employees subject to the pre-2022 version of VOWA or employees subject to the distinctive requirements of a particular Brewery department.

The subclass tool does not guarantee predominance and commonality. The district court would still need to conduct a complete Rule 23 analysis for each discrete subclass. *Bojangles*, 123 F.4th at 683. But because properly defined subclasses should exhibit greater homogeneity, they are more likely to survive Rule 23 scrutiny than the current sweeping class definition.

17

IV.

The right of workers to their honestly earned wages is weighty. Hourly employees commit their lives to often grueling or repetitive endeavors, working hard for the betterment of themselves and their families. The law respects their labors and the larger contribution to society made pursuant thereto. The law likewise respects the practical wisdom and balance embodied in the Federal Rules of Civil Procedure. Rule 23's requirements are firm and clear, and we must therefore strive to "ensure that the class-action train stays on the tracks." *Bojangles*, 123 F.4th at 683.

The class as presently defined contains far too much variation to warrant class certification. Any class-wide proceedings would merely devolve into countless mini-trials. This need not ultimately be the case. The district court may, in its discretion, find narrower subclasses properly tailored under Rule 23. Or it may deny class certification. We do not foreclose such pathways as are properly supported by the record. The certification order is thus remanded for proceedings consistent with this opinion.

*VACATED AND REMANDED IN PART, DISMISSED IN PART*

18